IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 5, 2012 Session Heard at Athens[1]

## STATE OF TENNESSEE v. JAMES DAVID MOATS

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for McMinn County**
**No. 09048     Carroll L. Ross, Judge**

_____

**No. E2010-02013-SC-R11-CD - Filed March 22, 2013**

_____

While on routine patrol in the early hours of the morning, a police officer observed a pick-up truck parked in a shopping center lot. Because the truck's headlights were turned on, the officer drove into the lot, stopped her patrol car directly behind the truck, and activated her blue lights. Although the officer had seen no indication of criminal activity or distress, she approached the truck, observed a beer can in a cup holder inside, and found the defendant in the driver's seat with the keys in the ignition. When she determined that the defendant had been drinking, he was arrested and later convicted for his fourth offense of driving under the influence. The Court of Criminal Appeals reversed the conviction, holding that the defendant was seized without either probable cause or reasonable suspicion. While we acknowledge that the activation of blue lights will not always qualify as a seizure, the totality of the circumstances in this instance establishes that the officer seized the defendant absent probable cause or reasonable suspicion and was not otherwise acting in a community caretaking role. The judgment of the Court of Criminal Appeals is affirmed, the conviction is reversed, and the cause dismissed.

### Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed

GARY R. WADE, C.J., delivered the opinion of the Court, in which JANICE M. HOLDER and SHARON G. LEE, JJ., joined. CORNELIA A. CLARK and WILLIAM C. KOCH, JR., JJ., filed a dissenting opinion.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Cameron L. Hyder, Assistant Attorney General; Robert Steven Bebb, District Attorney

[1] Oral argument was heard in this case on October 5, 2012, in Athens, McMinn County, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

General; and James H. Stutts, Assistant District Attorney General, for the appellant, State of Tennessee.

Matthew C. Rogers (at trial and on appeal), and Randy Rogers (at trial), Athens, Tennessee, for the appellee, James David Moats.

## OPINION
### I. Facts and Procedural History
### A. Suppression Hearing

At approximately 2:00 a.m. on Sunday, December 7, 2008, Officer Phyllis Bige of the Etowah Police Department observed an individual, later identified as James David Moats (the "Defendant"), sitting in the driver's seat of a pick-up truck in the parking lot of a BI-LO Grocery. Citizens National Bank, located next door to the grocery, was closed at the time, but a BP gas station across the parking lot was open. "No loitering" signs had been posted at the location, and, previously, a business owner had asked the police to patrol the area more frequently after business hours because of suspected illegal drug activity. As Officer Bige drove by in her patrol car, she noticed that the headlights of the truck were turned on but the engine was not engaged. Officer Bige, who described what she had seen as "out of the ordinary," continued on patrol; however, when she returned to the parking lot some five minutes later and the truck was in the same position, she parked her patrol car behind the truck, activated her blue lights, and called in the license plate number.

As Officer Bige walked toward the truck, she noticed that the window on the driver's side was rolled down. She asked the Defendant "if he was okay," and he replied, "I'm fine." At that point, Officer Bige saw an open beer can in a cup holder on the dash of the truck and keys in the ignition. When she asked why he was parked there, the Defendant replied that he was "just there" and admitted that he had been drinking "a few beers." According to the officer, the Defendant appeared to be "disoriented, very slow to speak, very sleepy acting," and he was unable to produce either identification or registration for the truck. When Officer Bige's sergeant arrived at the scene, the Defendant struggled to get out of his vehicle and then performed poorly on three field sobriety tests. After being arrested for driving under the influence, the Defendant consented to a test for blood alcohol content, which registered 0.19%.

During cross-examination at the suppression hearing, Officer Bige stated that the Defendant was the only person in the parking lot at the time of his arrest. She conceded that she did not see him drive the truck or otherwise do anything illegal before she approached the vehicle. The officer agreed that the Defendant did not appear to be in need of medical assistance and explained that she stopped to investigate only because it appeared "strange that a car would be . . . in a parking lot at almost . . . 2 a.m. with the lights on." She

acknowledged that when she turned on the blue lights, it was "fair to say that [the Defendant] was not free to leave."

At the conclusion of Officer Bige's testimony, the trial court denied the Defendant's motion to suppress, holding that under these circumstances a police officer, in the role of a community caretaker, is permitted to approach a parked vehicle and to ask for the driver's identification and proof of vehicle registration, and, upon observing possible criminal activity, to detain, further investigate, and ultimately make an arrest.

**B. Trial**

Only Officer Bige and the Defendant testified at trial. The officer repeated the testimony that she had provided at the hearing on the motion to suppress. She stated that she observed while her sergeant first administered the nystagmus test[2] and then asked the Defendant to do a finger count and recite the alphabet. In her opinion, the Defendant was unable to perform the finger count or to accurately recite the alphabet. As indicated, a blood sample taken from the Defendant established that his blood alcohol content was well over the legal limit.

The Defendant presented a convoluted explanation designed to show that even though he had been drinking excessively, he had not driven his truck to the parking lot. He testified that several hours before his arrest, Bill Hyatt, with whom he had worked years earlier, and a second man, whom he could not identify, stopped by his residence for a visit. He claimed that the unidentified man left after a brief period of time. The Defendant related that he then drove Hyatt to the Log Cabin Bar for drinks and that, later, the unidentified man met them at the bar but did not drink. According to the Defendant, when the three men left the bar, Hyatt drove the pick-up truck, the Defendant rode in the passenger seat, and the unidentified man followed in his separate vehicle. The Defendant stated that when they arrived at the BI-LO parking lot, the other two men left in the unidentified man's vehicle. He explained that he moved into the driver's seat because it was a cold night, cool temperatures exacerbated his pain from a prior back injury, and the truck only had heat on the driver's side. The Defendant contended that when Officer Bige drove by the first time, his truck's engine was running (presumably to heat the interior), but that he had turned the engine off by the time of her return. While asserting that he was not aware of the presence of the beer in his truck, the Defendant admitted that he was intoxicated. He also acknowledged that when questioned at the scene, he did not inform Officer Bige about Hyatt or the unidentified man.

---

[2] "Nystagmus is an involuntary jerking movement of the eye either as it attempts to focus on a fixed point or as it moves to one side." State v. Murphy, 953 S.W.2d 200, 202 (Tenn. 1997). The Horizontal Gaze Nystagmus test is a type of standardized field sobriety test that tracks the movements of the eyes in order to gauge whether a suspect might be driving under the influence. See id. at 201-02.

At the conclusion of the proof, the jury found the Defendant guilty of driving under the influence, his fourth offense, and thus a Class E felony. The trial court imposed a Range I sentence of two years.

### C. Appeal

On the appeal as of right, the Court of Criminal Appeals ruled that the Defendant had been seized by Officer Bige at the time the blue lights were activated, reversed the conviction, and dismissed the charge, concluding that at the time of the seizure, the officer lacked a reasonable suspicion based upon specific and articulable facts that the Defendant had either committed a criminal offense or was about to do so. Citing State v. Williams, 185 S.W.3d 311 (Tenn. 2006), the Court of Criminal Appeals held that these circumstances did not fall within the officer's community caretaking function because "'the [D]efendant's encounter with the officer was not voluntary, but rather occurred under a show of authority—the activation of the blue emergency lights—from which a reasonable person would not have felt free to leave.'" State v. Moats, No. E2010-02013-CCA-R3-CD, 2011 WL 5374129, at *4 (Tenn. Crim. App. Nov. 8, 2011) (quoting Williams, 185 S.W.3d at 317).

This Court granted the State's application for permission to appeal to consider whether the actions of the arresting officer qualified as within her community caretaking role and, therefore, required neither the probable cause necessary to support an arrest nor the level of reasonable suspicion, supported by specific and articulable facts, necessary to support an investigatory stop.

### II. Standard of Review

The standard of review applicable to suppression issues is well established. When the trial court makes findings of fact after a suppression hearing, its conclusions are binding upon this Court unless the evidence in the record preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). As a general rule, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. When the findings of fact are based entirely on evidence that does not involve issues of witness credibility, an appellate court conducts a de novo review. State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000). Review of a trial court's application of law to the facts is de novo with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999)).

### III. Analysis

Both the federal and state constitutions provide protections from unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered by virtue thereof is subject to suppression. See

U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Tenn. Const. art. I, § 7 ("[T]he people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."). "[T]he most basic constitutional rule . . . is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); see also State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997).[3]

These constitutional protections are designed to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Randolph, 74 S.W.3d 330, 334 (Tenn. 2002) (quoting Camara v. Mun. Ct., 387 U.S. 523, 528 (1967)); see also State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998). "The touchstone of the Fourth Amendment is reasonableness." Florida v. Jimeno, 500 U.S. 248, 250 (1991) (citing Katz, 389 U.S. at 360); see also Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 619 (1989); State v. Scarborough, 201 S.W.3d 607, 616 (Tenn. 2006). "While arrests and investigatory stops are seizures implicating constitutional protections, consensual encounters are not." State v. Nicholson, 188 S.W.3d 649, 656 (Tenn. 2006). The United States Supreme Court has held that a seizure does not necessarily occur when "a police officer approaches an individual and asks a few questions." Florida v. Bostick, 501 U.S. 429, 434 (1991).

Consistent with these principles, this Court has long recognized three categories of police interactions with private citizens: (1) a full-scale arrest, which requires probable cause, see Dunaway v. New York, 442 U.S. 200, 209-10 (1979); State v. Echols, 382 S.W.3d 266, 277 (Tenn. 2012); (2) a brief investigatory detention, requiring reasonable suspicion of wrongdoing, see Terry v. Ohio, 392 U.S. 1, 25-26 (1968); State v. Williamson, 368 S.W.3d 468, 474 (Tenn. 2012); and (3) a brief police-citizen encounter, requiring no objective justification, see United States v. Mendenhall, 446 U.S. 544, 553 (1980); State v. Ingram, 331 S.W.3d 746, 756 (Tenn. 2011). See United States v. Berry, 670 F.2d 583, 591 (5th Cir. 1982) (recognizing a three-tier analysis for warrantless encounters with police); Nicholson, 188 S.W.3d at 656; State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000). "Of the three categories, only the first two rise to the level of a 'seizure' for constitutional analysis purposes." State v. Day, 263 S.W.3d 891, 901 (Tenn. 2008).

---

[3] Exceptions to the warrant requirement include searches incident to arrest, plain view, hot pursuit, exigent circumstances, and others, such as consent to search. See State v. Cox, 171 S.W.3d 174, 179 (Tenn. 2005). As explained below, while the dissent would have us apply the community caretaking doctrine as yet another exception to the warrant requirements of the Fourth Amendment and article I, section 7, we find no basis to further erode the constitutional protections against unreasonable searches and seizures.

**A. Investigatory Stop**

A full-scale arrest supported by probable cause does not, of course, require a warrant. See State v. Hanning, 296 S.W.3d 44, 48 (Tenn. 2009) (citing Brown v. Illinois, 422 U.S. 590, 598 (1975)).

> Probable cause for an arrest without a warrant exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are "sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense."

Bridges, 963 S.W.2d at 491 (second alteration in original) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)); see also State v. Richards, 286 S.W.3d 873, 879 (Tenn. 2009). In this instance, the State makes no claim that Officer Bige had probable cause to arrest the Defendant; rather, the State asserts that the circumstances justified an investigatory stop, which does not require a warrant. See Terry, 392 U.S. at 20, 27.

When an officer has reasonable suspicion, supported by specific and articulable facts, to believe that a criminal offense has been or is about to be committed, a brief investigatory detention is permitted. Id. at 21; State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998). Reasonable suspicion must be supported by more than the officer's "inchoate and unparticularized suspicion or 'hunch,'" Terry, 392 U.S. at 27; however, "'reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause . . . [and] can arise from information that is less reliable than that required to show probable cause.'" State v. Pulley, 863 S.W.2d 29, 32 (Tenn. 1993) (quoting Alabama v. White, 496 U.S. 325, 330 (1990)); see also Day, 263 S.W.3d at 903.

Trial courts must examine the totality of the circumstances when evaluating whether an officer has established the requisite level of suspicion to justify a Terry stop. Binette, 33 S.W.3d at 218. These circumstances include an officer's observations, information from other law enforcement personnel or agencies, information from citizens, known patterns of criminal offenders, or deductions based upon experience. State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). When evaluating the reasonableness of the police officer's suspicion, the nature of the crime suspected may be a factor. See State v. Winn, 974 S.W.2d 700, 703 (Tenn. Crim. App. 1998) ("A frisk has been upheld as reasonable when the suspected crime might typically involve the use of a weapon . . . [such that] an officer [may] reasonably infer that a weapon might be in the possession of the suspect.").

Seventeen years ago, our Court of Criminal Appeals, relying on a ruling of the United States Supreme Court, addressed whether a vehicle in a high crime area after midnight served as a basis for an investigatory stop, and concluded that more was required to meet constitutional standards:

> In the instant case, the police officer's sole justification for stopping the appellant was the appellant's presence in a "high crime area" at 2:00 a.m. At least one court has observed that "an area's propensity toward criminal activity is something that an officer may consider . . . . The lateness of the hour is another fact that may raise the level of suspicion." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993). However, the same court acknowledged and the Supreme Court has held that an individual's presence in a high crime area, standing alone, is not a basis for concluding that the individual himself is engaged in criminal conduct. Id.[; see also Brown v. Texas, 443 U.S. 47, 52 (1979)]. We conclude, moreover, that the lateness of the hour, without more, does not elevate the facts of this case to the level of reasonable suspicion.

State v. Lawson, 929 S.W.2d 406, 408 (Tenn. Crim. App. 1996).

More recently, our Sixth Circuit Court of Appeals considered similar circumstances and found no basis for an investigatory stop:

> The first two facts—presence in a high-crime location and the lateness of the hour—may not, without more, give rise to reasonable suspicion, but they may be considered in the totality of the circumstances. Nonetheless, these are context-based factors that would have pertained to anyone in the [area] at that time and should not be given undue weight. This caveat is especially appropriate in this case, because while [the officer] testified that the area was known for drug trafficking specifically, he observed no conduct from [the defendant] consistent with drug activity.

United States v. Johnson, 620 F.3d 685, 692-93 (6th Cir. 2010) (first alteration in original) (emphasis added) (citations and internal quotation marks omitted).

Finally, in United States v. See, 574 F.3d 309 (6th Cir. 2009), the Sixth Circuit Court of Appeals considered facts almost identical to those in the case before us. In See, a patrol officer observed three men sitting in a parked car at a public housing complex at 4:30 a.m. Id. at 311. The officer parked his police car so as to prevent the driver, See, from driving away. Upon investigation, the officer found a firearm under the driver's seat and made an arrest. Id. The district court upheld the investigatory stop and subsequent arrest, observing

that the area had a reputation for illegal activities, that the officer had been instructed to give special attention to loiterers, and that See was in a dimly lit area of the parking lot away from the building at an odd hour of the morning. Id. at 312-13.

The conviction was reversed on appeal. The Sixth Circuit first held that when the officer blocked See's vehicle with a marked patrol car, a seizure had taken place because "a reasonable person in See's position would not have felt free to leave." Id. at 313; see also United States v. Foster, 376 F.3d 577, 584 (6th Cir. 2004) ("A consensual encounter can ripen into a seizure if 'in light of all of the circumstances, [ ] a reasonable person [would] have believed that he or she was not free to walk away.'" (quoting United States v. Grant, 920 F.2d 376, 382 (6th Cir. 1990) (internal quotation marks omitted))). Moreover, the court held that the early hour of the morning, the high crime area, and the request that the officer be on the lookout for loiterers, among the other factors present, did not qualify as reasonable suspicion, explaining that the officer was not responding to a complaint, did not suspect the men of a specific crime, did not observe the men acting suspiciously, and did not cause them to flee upon seeing his police car. See, 574 F.3d at 314. In a concurring opinion, a circuit judge explained how what had begun as a consensual encounter transformed into an illegal investigatory stop by virtue of a premature seizure:

> [B]ecause Officer Williams observed the men only for a moment before blocking their exit and had not seen them do anything other than sitting in See's vehicle, I cannot say that there were articulable facts that criminal activity may be afoot, or that the officer had anything more than an ill-defined hunch[ ]. Officer Williams had every right to investigate further, but he should have simply parked his patrol car alongside See's vehicle to carry out the investigation in a consensual manner. Instead, he parked his patrol car in such a way so as to block in See's vehicle, thus transforming the encounter into a *Terry* stop.

Id. at 315 (Gilman, J., concurring) (second alteration in original) (emphasis added) (citations and internal quotation marks omitted).

In this case, the Court of Criminal Appeals considered the totality of the circumstances, reviewed Officer Bige's testimony and observations, and concluded that there existed no reasonable suspicion of illegal activity at the time of the stop. While the State argues otherwise, we fully concur that Officer Bige was unable to offer specific and articulable facts sufficient to qualify as reasonable suspicion that the Defendant had committed or was about to commit a criminal offense. She conceded that she did not see the Defendant drive the truck, engage in a drug transaction, or otherwise do anything illegal before activating her blue lights and approaching the truck. The early morning hour and a

general request for officers to be on the lookout for suspected illegal drug activity do not, without more, rise to the level of reasonable suspicion. As acknowledged by the Court of Criminal Appeals, an "inchoate and unparticularized suspicion or hunch" does not meet the standard required for an investigatory stop. Moats, 2011 WL 5374129, at *4 (quoting Terry, 392 U.S. at 27).

### B. Community Caretaking

Our primary concern in this instance is whether the actions of Officer Bige qualified as a valid exercise of the community caretaking function, which is defined within the third tier of police-citizen encounters. Unlike full-scale arrests and investigatory detentions, third-tier encounters are consensual and do not require probable cause or reasonable suspicion. State v. Hawkins, 969 S.W.2d 936, 939 (Tenn. Crim. App. 1997). These consensual encounters include "community caretaking or public safety functions that involve no coercion or detention." Id. (emphasis added). In Cady v. Dombrowski, 413 U.S. 433, 441 (1973), the United States Supreme Court made its first reference to community caretaking functions, describing the role of the officer in these situations as "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."

Ten years later, the Supreme Court confirmed that some police-citizen encounters were consensual and, in consequence, did not fall within the protections of the Fourth Amendment:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed.

Florida v. Royer, 460 U.S. 491, 497-98 (1983) (plurality opinion) (emphasis added) (citations omitted); see also United States v. Drayton, 536 U.S. 194, 201-02 (2002) ("Even when law enforcement officers have no basis for suspecting a particular individual, they may pose

questions, ask for identification, and request consent to search . . . [,] provided they do not induce cooperation by coercive means.").

Based in great measure upon these rulings, our courts have consistently recognized that police officers may approach an individual in a public place, whether walking or in a parked car, and ask questions without implicating constitutional protections. See Daniel, 12 S.W.3d at 426; Pulley, 863 S.W.2d at 30; State v. Gonzalez, 52 S.W.3d 90, 95 (Tenn. Crim. App. 2000); State v. Butler, 795 S.W.2d 680, 685 (Tenn. Crim. App. 1990); see also 4 Wayne R. LaFave, Search and Seizure § 9.4(a), at 433 (4th ed. 2004). As the Court of Criminal Appeals observed in Hawkins, "[w]ith regard to the community caretaking function, it is now generally held that the police may engage a citizen and ask questions as long as the citizen is willing to carry on the conversation." 969 S.W.2d at 939. In Hawkins, the police officer pulled his patrol car behind an awkwardly parked vehicle on a public street and walked toward a person who was standing outside of the vehicle drinking a beer. Id. at 937-38. As the officer got closer, he saw in plain view a white powdery substance, a plastic bag, and an open beer can between the legs of the defendant, who was sitting inside the parked vehicle. Id. at 938. The defendant admitted that the plastic bag belonged to him, and he was arrested after the officer searched the vehicle and discovered cocaine. Id. Upholding the propriety of the arrest, the Court of Criminal Appeals ruled that the officer was acting within his community caretaking role when he approached the awkwardly parked vehicle. Id. at 938-39; see also Dombrowski, 413 U.S. at 442 ("[E]xtensive, and often noncriminal contact with automobiles will bring local officials in 'plain view' of evidence, fruits, or instrumentalities of a crime, or contraband.").

While the facts in Hawkins are similar to those in the case before us, the opinion in Hawkins indicates that although the officer pulled his patrol car behind the awkwardly parked vehicle, he did not activate his blue lights or otherwise exhibit any show of authority. The more difficult question with which we are now faced is whether Officer Bige acted within her role as a community caretaker, like the officer in Hawkins, or if she exceeded the scope of the community caretaking function by activating her blue lights under the circumstances.

As stated, the community caretaking function exists within the third tier of consensual police-citizen encounters that do not require probable cause or reasonable suspicion, whereas the requisite level of probable cause or reasonable suspicion must be satisfied when a seizure has taken place. See, e.g., Randolph, 74 S.W.3d at 338. The definition of a seizure in this state, as developed by a series of decisions by this Court, varies slightly from the federal definition. In California v. Hodari D., 499 U.S. 621, 626 (1991), the United States Supreme Court determined that a seizure occurs only when an officer uses physical force to detain or when an individual submits to the officer's show of authority. In contrast, this Court has

-10-

traditionally interpreted article I, section 7 of the Tennessee Constitution as imposing stronger protections than those of the federal constitution, and, therefore, as requiring a departure from federal precedent when "(1) adopting federal Fourth Amendment standards would require overruling a settled development of state constitutional law; and (2) when linguistic differences justify distinct interpretations of state and federal constitutional provisions." Randolph, 74 S.W.3d at 334 (quoting State v. Vineyard, 958 S.W.2d 730, 733-34 (Tenn. 1997)) (internal quotation marks omitted). Applying the first prong, this Court has explicitly rejected the definition of "seizure" established in Hodari D., opting instead to maintain the definition originally set forth in Mendenhall, 446 U.S. at 554, that is, "whether, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed he or she was not free to leave.'" Randolph, 74 S.W.3d at 336 (quoting Daniel, 12 S.W.3d at 425).

Consistent with Mendenhall and the constitutional standards developed in our state, this Court has adopted a totality of the circumstances test for determining whether a seizure has occurred. Daniel, 12 S.W.3d at 425.

> Some of the factors which are relevant and should be considered by courts when applying this totality of the circumstances test include the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the physical touching of the person of the citizen.

Id. at 425-26. Recognizing that "[t]he test is necessarily imprecise," Michigan v. Chesternut, 486 U.S. 567, 573 (1988), we further identified several examples of when a police-citizen encounter has been found to involve a seizure:

> [A]n officer: (1) pursues an individual who has attempted to terminate the contact by departing; (2) continues to interrogate a person who has clearly expressed a desire not to cooperate; (3) renews interrogation of a person who has earlier responded fully to police inquiries; (4) verbally orders a citizen to stop and answer questions; (5) retains a citizen's identification or other property; (6) physically restrains a citizen or blocks the citizen's path; (7) displays a weapon during the encounter.

Daniel, 12 S.W.3d at 426 (citing 4 Wayne R. LaFave, Search and Seizure § 9.3(a), at 104 (3d ed. 1996 & Supp. 1999)).

In the same year this Court decided <u>Daniel</u>, the Court of Criminal Appeals, in <u>Gonzalez</u>, considered whether a seizure had occurred, thereby implicating constitutional protections, when an officer activated the blue lights on his patrol car after coming upon a stopped vehicle. 52 S.W.3d at 97. The police learned that Gonzalez, who was believed to be a passenger in a blue Ford Taurus, may have been involved in a cocaine transaction. <u>Id.</u> at 93. During a routine patrol, an officer observed the Taurus driving in the opposite direction, made a U-turn, and followed the Taurus onto a dead-end street. <u>Id.</u> When the Taurus stopped at the end of the street, the driver of the Taurus exited the vehicle and walked toward the officer's patrol car. <u>Id.</u> As the driver approached, the officer ordered him back into the Taurus and activated his blue lights. <u>Id.</u> The officer then approached the Taurus, smelled marijuana, and found a small amount of cocaine and some drug paraphernalia inside the vehicle. <u>Id.</u> He also discovered that Gonzalez was in fact a passenger in the vehicle and that there was a bag of cocaine underneath his seat. <u>Id.</u> The Court of Criminal Appeals held that a seizure had occurred when the officer activated his blue lights and ordered the driver back into his vehicle, indicating "a show of authority such that a reasonable person in the position of either [Gonzalez] or [the driver] would not have felt free to leave." <u>Id.</u> at 97.

The court further observed as follows:

In the context of stopping a moving vehicle, as opposed to a seizure of a parked vehicle, our supreme court has maintained that "[w]hen an officer turns on his blue lights, he or she has clearly initiated a stop." <u>We see little difference, from the perspective of the occupants in the vehicle, in turning on the blue lights behind a moving vehicle and turning on the blue lights behind a parked vehicle. The lights still convey the message that the occupants are not free to leave.</u>

<u>Id.</u> (emphasis added) (citation omitted). The Court of Criminal Appeals, while holding that Gonzalez had been the subject of a seizure, thereby implicating constitutional protections, specifically addressed the burden placed upon police officers under the same or similar circumstances:

[W]e are cognizant of the difficult decisions police officers face daily in the exercise of their duties. We realize that when officers desire to question citizens without reasonable suspicion to do so, they may also want to activate their emergency equipment for their own safety so that they will be visible to others. . . . <u>Under our decision, police officers who wish to question individuals may be faced with the unsettling choice of whether to activate their emergency equipment for their safety and run the risk of later suppression of any evidence obtained as a result of their questioning or whether to forego</u>

questioning the individuals altogether. <u>Such a dilemma does not, however, alter our result</u>. . . . [T]he test for determining whether a seizure occurs examines the circumstances from the standpoint of the citizen, not the police officer. If a reasonable person would not feel free to leave due to an officer's show of authority, that constitutes a seizure, regardless of why the officer made a show of authority.

<u>Id.</u> at 97-98 (emphasis added) (citation omitted).

Six years after the Court of Criminal Appeals decided <u>Gonzalez</u>, this Court addressed "whether [the single act of] activating blue lights constitutes a seizure when a vehicle is already stopped." <u>Williams</u>, 185 S.W.3d at 316. Citing <u>Gonzalez</u> and considering cases in other states with similar facts but with conflicting results, this Court concluded "that [Williams'] encounter with the officer was not voluntary, but rather occurred under a show of authority—the activation of the blue emergency lights—from which a reasonable person would not have felt free to leave." <u>Id.</u> at 317. While recognizing that "the officer may have subjectively intended to activate his blue lights solely for his safety and the safety of others on the road," this Court described "the objective belief of a reasonable person in the position of the defendant, not that of the officer," as the litmus test for a seizure. <u>Id.</u> at 318.

After confirming the holding in <u>Gonzalez</u> that "a police officer initiates a seizure by turning on his blue lights behind a parked vehicle because the lights convey the message that the occupants are not free to leave," <u>Williams</u>, 185 S.W.3d at 316 (citing <u>Gonzalez</u>, 52 S.W.3d at 97-98), this Court nevertheless made the following observation:

Not all use of the emergency blue lights on a patrol car will constitute a show of authority resulting in the seizure of a person. . . . <u>[W]hen officers act in their community caretaking function, they may want to activate their emergency equipment for their own safety and the safety of other motorists</u>.

<u>Id.</u> at 318 (emphasis added). Despite these qualifying statements, this Court applied the "litmus test" of "the objective belief of a reasonable person in the position of the defendant, not that of the officer," to find that Williams had been seized by the officer's use of the blue lights. <u>Id.</u> Specifically, this Court pointed to the fact that "[t]here was <u>no evidence of an accident or other peril</u>. In fact, [Williams'] vehicle was the only vehicle in the area, so <u>the use of the blue lights was directed solely at [him]</u>." <u>Id.</u> (emphasis added). Moreover, there was nothing in that case "to indicate that the officer was concerned that [Williams] was in need of assistance." <u>Id.</u> In consequence, the Court rejected the possibility that the officer was acting within his community caretaking role. <u>Id.</u>

-13-

Although this Court acknowledged the community caretaking function, the ruling in Williams, especially in light of the language used by the Court of Criminal Appeals in Gonzalez, has been largely interpreted to mean that the activation of blue lights constitutes a seizure and, as a practical matter, negates the community caretaking function. See, e.g., Williamson, 368 S.W.3d at 476; Hanning, 296 S.W.3d at 49; State v. Ownby, No. E2011-00543-CCA-R3-CD, 2012 WL 1570987, at *6 (Tenn. Crim. App. May 3, 2012). While today we question our application of the law to the facts in Williams, we reaffirm the legal principles stated therein. In consequence, our objective in this instance is to provide some guidance as to when officers may activate their emergency equipment for "their own safety and the safety of other motorists," Williams, 185 S.W.3d at 318, without implicating constitutional protections. As indicated, the Mendenhall standard, as adopted in Daniel, is by definition fact intensive. While the establishment of a bright-line rule may not be possible, the Court of Criminal Appeals has provided examples, in several unreported cases, of when the activation of blue lights has not resulted in a seizure.

In State v. Jensen, No. E2002-00712-CCR-R3-CD, 2002 WL 31528549 (Tenn. Crim. App. Nov. 15, 2002), the Court of Criminal Appeals discussed the permissible use of emergency equipment in the exercise of a community caretaking function. An officer and an ambulance driver met at a road intersection and parked their respective vehicles on opposite sides of the road to have a conversation. Id. at *1. The red lights of the ambulance were flashing at the time but the blue lights of the police car were not. Id. Jensen drove into the intersection behind the police car and the ambulance, where his car stalled. Id. When Jensen could not restart his vehicle, the officer activated his blue lights, stepped out of his patrol car, approached Jensen, and asked if he was having car trouble. Id. He answered, "Yeah, I cannot get my vehicle started." Id. When the officer smelled alcohol and saw that Jensen's face was flushed, he asked him to step out of the vehicle and subsequently made an arrest. Id. While acknowledging that the "activation of blue lights ordinarily triggers a 'stop' or 'seizure,'" the Court of Criminal Appeals observed that "it is not unusual for a police officer to activate the blue lights on his or her patrol car for safety purposes when on the side of a road or at an accident site." Id. at *2.[4]

---

[4] Notably, the Court of Criminal Appeals focused upon the perspective of Jensen, who testified at trial that "he stopped because he thought an accident had occurred, not because he thought [the officer] had indicated he was required to stop." Id. at *3. Further, even if a police officer initially activates his or her blue lights within a community caretaking function, there is a point at which the encounter may no longer be consensual, and, therefore, becomes a seizure. The court in Jensen noted that "the initial contact between [Jensen] and [the officer] did not constitute a seizure, but rather was a consensual encounter"; however, "once [the officer] requested [Jensen] to step out of the vehicle, the consensual encounter was converted into a seizure requiring constitutional protections." Id. at *4.

The Court of Criminal Appeals also approved the use of an officer's blue lights in the exercise of a community caretaking function in State v. Vandergriff, No. E2010-02560-CCA-R3-CD, 2012 WL 2445049, at *4 (Tenn. Crim. App. June 28, 2012). At approximately 9:00 p.m., a police officer "was forced to 'slam on his brakes' to avoid hitting [an occupied] truck, which was parked in a 'no pass' zone on [a] two-lane highway." Id. at *1. Observing moderate traffic on the highway, the officer activated his blue lights so that other motorists would be aware of the presence of his patrol car and of the truck. Id. When the driver stepped out of his truck, without being ordered to do so by the officer, he was unsteady on his feet. Id. The officer administered field sobriety tests, and the driver was arrested and later convicted for driving under the influence. Id. at *1-2. Although the driver argued that he had been seized without reasonable suspicion, id. at *1, the Court of Criminal Appeals distinguished Williams and held that the officer had acted within his community caretaking role because

> he activated his blue lights to alert other motorists to prevent them for slamming into his vehicle, as he had almost slammed into the defendant's parked truck. The activation was safety based and done out of concern for the defendant, himself, and other motorists on the roadway. . . . It was not done as a show of authority directed at the defendant.

Id. at *4 (emphasis added); see also Dombrowski, 413 U.S. at 441 (defining the community caretaking function in the context of "the extensive regulation of motor vehicles and traffic" and "the frequency with which a vehicle can become disabled or involved in an accident on public highways").[5]

In this instance, the Court of Criminal Appeals rejected the State's argument that Officer Bige was acting within her community caretaking role because "there was no indication that the [D]efendant needed assistance nor was there any other evidence that she needed to activate the lights for safety reasons." Moats, 2011 WL 5374129, at *4. Unlike Vandergriff, where the officer nearly slammed into the back of a truck that was stopped in the middle of a highway, Officer Bige, who had been made aware of possible illegal drug activity in the area, parked her patrol car immediately behind the Defendant's truck, which

---

[5] In Vandergriff, the defendant and the officer exited their vehicles simultaneously, so the encounter did not become a seizure until the officer "observed certain behavior by the defendant which led to a reasonable suspicion that he was under the influence." 2012 WL 2445049, at *4. We note that if an officer proceeds to check on a stalled car that is blocking a roadway and appears to need assistance, the community caretaking function ends when the circumstances cease to indicate that the motorist is in need of assistance. See State v. Anderson, No. M2006-00138-CCA-R3-CD, 2006 WL 2716873, at *1, *3 (Tenn. Crim. App. Sept. 25, 2006) (reversing conviction based on unreasonable search and seizure because officer activated blue lights after he had already observed defendant's vehicle move into roadway and continue driving properly).

was the only vehicle in the otherwise empty parking lot. There was no objective indication that Officer Bige needed to activate the blue lights to protect either the Defendant or other motorists from possible harm.[6] Finally, without any likelihood of an accident or peril, the activation of Officer Bige's blue lights was directed solely at the Defendant. Because no other cars were in the parking lot and the officer parked directly behind the Defendant, the blue lights could hardly be interpreted as for any purpose other than a notice to the Defendant. Under the totality of these circumstances, a reasonable person would not have felt free to leave. See Williams, 185 S.W.3d at 318. In consequence, the use of blue lights qualified as a seizure of the Defendant.

Our extensive research suggests that community caretaking can generally be classified into several categories, all of which are separate and distinct from traditional criminal investigation or detection.[7] The primary form of community caretaking, which is illustrated by Hawkins, Jensen, and Vandergriff, is also known as the public safety function and is the type of community caretaking originally identified by the United States Supreme Court. See Naumann, 26 Am. J. Crim. L. at 338 (citing Dombrowski, 413 U.S. at 441). In Dombrowski, the Court observed that

> [b]ecause of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office.

---

[6] As we stated in Williams, the "litmus test" for whether the activation of blue lights qualifies as a seizure is "the objective belief of a reasonable person in the position of the defendant, not that of the officer." 185 S.W.3d at 318. The fact that an officer may subjectively intend the use of blue lights as a safety measure is irrelevant.

[7] Since the United States Supreme Court decided Dombrowski, the community caretaking function has been extended to include "sobriety checkpoints, border searches, drug testing, inventory searches, and searches in public schools." Michael R. Dimino, Sr., Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness, 66 Wash. & Lee L. Rev. 1485, 1490 (2009) [hereinafter Dimino, 66 Wash. & Lee L. Rev.]. The community caretaking role has also been used to justify the "emergency aid doctrine" and the "automobile impoundment/inventory doctrine." Mary Elisabeth Naumann, The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception, 26 Am. J. Crim. L. 325, 330 (1999) [hereinafter Naumann, 26 Am. J. Crim. L.]. We decline to address the myriad circumstances under which the community caretaking function might apply in our state. It is sufficient at this time to conclude that the activation of blue lights on a police vehicle will not always qualify as a seizure, and that the blue lights may be used for community caretaking purposes unrelated to the investigation or detection of criminal activity, when not used as a show of authority directed at a particular person.

413 U.S. at 441. Like the community caretaking standards that have developed in our state, this type of community caretaking described by the Supreme Court "supports relatively minor or regular interactions with the police: approaching parked cars when the driver appears incapacitated or sick or the car is functioning improperly and approaching pedestrians who appear lost, in danger, or ill." Naumann, 26 Am. J. Crim. L. at 339 (footnote omitted). The core of any community caretaking function is when the police act to protect or assist the public in some manner outside of "the crime-control paradigm."[8] Dimino, 66 Wash. & Lee L. Rev. at 1490.

---

[8] We are aware that the doctrine of community caretaking, as interpreted and applied in our state—i.e., as a type of third-tier consensual police-citizen encounter—represents a minority rule among other jurisdictions. Indeed, as the dissent points out, the vast majority of courts have applied the community caretaking doctrine as "an exception" to the warrant requirement of the Fourth Amendment to the United States Constitution. E.g., United States v. Coccia, 446 F.3d 233, 237-38 (1st Cir. 2006); United States v. Pichany, 687 F.2d 204, 205 (7th Cir. 1982); People v. Luedemann, 857 N.E.2d 187, 198-99 (Ill. 2006); State v. Graham, 175 P.3d 885, 890 (Mont. 2007); Ullom v. Miller, 705 S.E.2d 111, 120 (W. Va. 2010). As noted in this opinion, however, this Court has for decades interpreted article I, section 7 of the Tennessee Constitution as imposing stronger protections than those of the federal constitution, which, under stare decisis, we are not prepared to dismissively brush aside. Particularly in the area of search and seizure law, we have often rejected the standards adopted by the United States Supreme Court in favor of more protective doctrines, tests, and rules. See, e.g., State v. Carter, 16 S.W.3d 762, 768 n.8 (Tenn. 2000) (noting that Tennessee has never recognized the "good faith" exception to the exclusionary rule that was adopted by the Supreme Court in United States v. Leon, 468 U.S. 897 (1984)); State v. Jacumin, 778 S.W.2d 430, 435-36 (Tenn. 1989) (refusing to adopt the test for probable cause as established by the Supreme Court in Illinois v. Gates, 462 U.S. 213 (1983), because it is "inadequate"); State v. Lakin, 588 S.W.2d 544, 549 n.2 (Tenn. 1979) ("Where, . . . as in the particular phase of search and seizure law under consideration, there has been a settled development of state constitutional law which does not contravene the federal, we are not inclined to overrule earlier decisions unless they are demonstrably erroneous.").

While we recognize the rationale underlying the majority rule, we see no reason to depart from the standards of community caretaking that have developed in our state, particularly because neither party has articulated a persuasive basis for recognizing this as yet another exception to the constitutional protections against unreasonable searches and seizures. See Lakin, 588 S.W.2d at 549 (recognizing that, in the context of the "open fields" doctrine, "[a]lthough the decisions in this state may be somewhat more restrictive than those in other states or than federal decisions, no compelling reason has been demonstrated in this case for modifying or overruling them"). The Defendant has argued strongly against treating community caretaking as an exception to the warrant requirement, and the State has simply asserted that "the touchstone of this fact-intensive analysis is reasonableness." Unlike the dissent, we decline to adopt an approach to community caretaking that would diminish "the most basic constitutional rule" that warrantless searches and seizures are per se unreasonable, simply because it has been adopted by a majority of other courts. In any event, the core basis for applying any form of the community caretaking doctrine requires that the officer's actions be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Dombrowski, 413 U.S. at 441. In consequence, even under the test employed by the dissent, Officer Bige's actions would not qualify as community caretaking.

## IV. Conclusion

Although the activation of blue lights on a police vehicle ordinarily triggers a stop or seizure, thereby implicating constitutional protections, the totality of the circumstances must be considered to determine whether the police officer was acting within a community caretaking role, which is a concept separate and distinct from the investigation of possible criminal activity. As a general rule, if the activation of blue lights is not used as a show of authority directed at a particular person, the officer is acting within the community caretaking function and need not support his or her actions with reasonable suspicion or probable cause. Because the circumstances here demonstrate that the officer was not acting within a community caretaking role and did not have reasonable suspicion or probable cause to seize the Defendant, the judgment of the Court of Criminal Appeals is affirmed. The conviction is reversed and the cause dismissed. Costs are adjudged against the State.

_____
GARY R. WADE, CHIEF JUSTICE