# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
May 17, 2016 Session

## STATE OF TENNESSEE v. DEBORAH JEAN WESTON

**Appeal from the Circuit Court for Blount County**
No. C22651    Tammy Harrington, Judge

---

**No. E2015-01530-CCA-R3-CD – Filed August 2, 2016**

---

In this appeal as of right, the State challenges the order of the trial court granting the defendant's motion to suppress the evidence obtained during the stop of the defendant and dismissing the driving under the influence charge in this case. Because the community caretaking exception does not apply in this case and because reasonable suspicion did not otherwise justify the stop of the defendant's vehicle, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and D. KELLY THOMAS, JR., J., joined.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Mike Flynn, District Attorney General; and Tracy Jenkins, Assistant District Attorney General, for the appellant, State of Tennessee.

Joe Costner, Maryville, Tennessee, for the appellee, Deborah Jean Weston.

## OPINION

This case began with the defendant's warrantless arrest for driving under the influence ("DUI") on November 1, 2013. The affidavit of complaint, which is appended to the arrest warrant that was issued following her arrest, indicates that Maryville Police Department Officer Dwight W. Porter, III, observed "a motor vehicle accident" involving the defendant and another motorist. When he approached the defendant, she told him "that her foot slipped off the brake causing both vehicles to collide." The officer detected an odor of an alcoholic beverage about the defendant's person, and she told him "that she had consumed a glass of wine at a local restaurant." After the defendant performed poorly on field sobriety tests, she agreed to be transported

to the hospital to have her blood drawn for alcohol and toxicology testing. She was then taken to the Blount County Justice Center.

On January 9, 2014, the defendant moved the Blount County General Sessions Court to dismiss the charges, arguing that Officer Porter lacked "sufficient legal cause" to stop her vehicle and that the officer lacked "probable cause to make the subsequent arrest." No order disposing of the defendant's motion appears in the record on appeal.

In November 2014, the Blount County Grand Jury charged the defendant with alternative counts of DUI. On March 3, 2015, the defendant moved the Blount County Circuit Court to suppress all evidence obtained as a result of Officer Porter's stop of the defendant's vehicle and to dismiss the charges, arguing that the stop violated the defendant's Fourth Amendment rights.

At the July 10, 2015 hearing on the defendant's motion, Officer Porter testified that at approximately 8:00 p.m. on the day of the offense, he was traveling west on Highway 321 in Maryville when he, along with a number of other vehicles, stopped for the red light at the intersection of Highway 321 and the Highway 129 Bypass. He said that he was in the inside lane and that he observed the defendant's vehicle in the outside lane of Highway 321 two cars ahead of his. He described what happened next:

> I observed a white male that was out of his truck and . . . he looked at the rear of his truck and walked to . . . the [d]efendant's driver's side window and began talking with her. And then right as I flipped my blue lights on because to me it was obvious they had been involved in a motor vehicle accident, due to . . . how close the cars were together, in my experience as a police officer, led me to believe he was out of his car looking at the rear of his vehicle, which would indicate that his vehicle had been struck and he was checking it at that time, I initiated my lights in order to make sure that everybody was okay. Because I was under the understanding that there was an accident at that point.

The other cars allowed him to pull forward, and he eventually pulled behind the defendant's vehicle. By the time he got near the cars, the other driver had returned to his vehicle, and both drivers had begun moving forward. The other driver stopped his vehicle some distance away, but the defendant did not initially stop. Officer Porter did not indicate how far the defendant traveled before he was able to stop her vehicle.

-2-

The defendant, citing our supreme court's decision in *State v. Moats*, 403 S.W.3d 170 (Tenn. 2013), argued that Officer Porter's stopping the defendant to check on her welfare was not a recognized exception to the warrant requirement. She insisted that "the law is very clear" that a police officer "can't stop somebody for a welfare check to see if they're injured." The State argued that, in addition to community caretaking, the officer's stop of the defendant's vehicle was justified because the officer had reasonable suspicion that the defendant had violated traffic rules related to following too closely and failing to exercise due care. The State emphasized that the officer's subjective intent was irrelevant.

At the conclusion of the hearing, the trial court found that Officer Porter's testimony established that he stopped the defendant's vehicle for "a welfare check." The court concluded that "under the current line of cases," it was constrained to grant the defendant's motion.

In this appeal, the State asserts that the trial court erred by finding that Officer Porter lacked reasonable suspicion to stop the defendant's vehicle and asks this court to adopt a community caretaking exception to the warrant requirement. The defendant argues that under the standard announced by both the *Moats* majority and the dissent, the stop of the defendant's vehicle was unconstitutional, noting that the facts did not support a conclusion that anyone was in need of the assistance of a police officer.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence in the record preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

Our supreme court made its first extensive examination of the relationship between the community caretaking function of the police and the protections of the Fourth Amendment in *Moats*. In that case, the court concluded that "the community caretaking function exists within the third tier of consensual police-citizen encounters that do not require probable cause or reasonable suspicion, whereas the requisite level of probable cause or reasonable suspicion must be satisfied when a seizure has taken place." *State v. Moats*, 403 S.W.3d 170, 182 (Tenn. 2013), *overruled by State v. Kenneth McCormick*, ___ S.W.3d ___, No. M2013-02189-SC-R11-CD (Tenn. May 10, 2016). Recently, however, in *State v. Kenneth McCormick*, the court revisited the ruling in

-3-

*Moats* and concluded that "*Moats* was erroneous when initially decided and that more good than harm will be accomplished by overruling it." *Kenneth McCormick*, slip op. at 12-13. The court observed that "the holding in *Moats* is contrary to the overwhelming weight of authority in this country, which recognizes the community caretaking doctrine as an exception to federal and state constitutional warrant requirements" and that "the authority on which *Moats* relied to limit the community caretaking doctrine to consensual police-citizen encounters provides no support for the limitation." *Id.*, slip op. at 13 (citations omitted). The court specifically "overrule[d] *Moats* and disavow[ed] any other prior or subsequent Tennessee decisions limiting the community caretaking doctrine to consensual police-citizen encounters." *Id.*

In place of the framework established in *Moats*, the court recognized the community caretaking doctrine as "'analytically distinct from consensual encounters'" and determined that it "'[may be] invoked to validate a search or seizure as reasonable' under the Fourth Amendment and article I, section 7 of the Tennessee Constitution." *Id.* (citation omitted) (alteration in original). The court then expressed a test to determine the applicability of the community caretaking exception, beginning "with the foundational principle that '[a]n action is reasonable under the Fourth Amendment [and article I, section 7 of the Tennessee Constitution], regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action. The officer's subjective motivation is irrelevant.'" *Id.*, slip op. at 15 (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006)) (other citations and internal quotation marks omitted) (alteration in original). With this basis, the court held

> that the community caretaking exception will justify a warrantless seizure so long as "the State establishes that (1) the officer possessed specific and articulable facts which, viewed objectively and in the totality of the circumstances, reasonably warranted a conclusion that a community caretaking action was needed, such as the possibility of a person in need of assistance or the existence of a potential threat to public safety; and (2) the officer's behavior and the scope of the intrusion were reasonably restrained and tailored to the community caretaking need."

*Kenneth McCormick*, slip op. at 15 (quoting *Moats*, 403 S.W.3d at 195 (Clark and Koch, JJ., dissenting). A determination whether an officer acted reasonably in exercising his community caretaking function requires "careful consideration" of the facts presented "including 'the nature and level of distress exhibited by the citizen, the location, the time of day, the accessibility and availability of assistance other than the officer, and the risk

-4-

of danger if the officer provides no assistance.'" *Kenneth McCormick*, slip op. at 15 (quoting *Moats*, 403 S.W.3d at 195-96 (Clark and Koch, JJ., dissenting)).

In this case, Officer Porter testified that just after 8:00 p.m., he was traveling west on Highway 321 when he observed a number of other westbound cars stopped for the red light at the traffic light marking the intersection of westbound Highway 321 and the Highway 129 Bypass. He stated that he was "two cars back in the inside lane" while the defendant and the other driver "were in the outside lane." From his vantage point, he observed a man outside of a truck "looking at the rear of his truck." Officer Porter saw the man approach the driver's side window of the defendant's car and speak with her briefly. At that point, Officer Porter initiated his blue lights, but he said that he did not think that the drivers noticed that he had turned on the blue lights. By the time the officer was able to maneuver his cruiser behind the defendant's car, the man had returned to his truck, and both drivers had begun moving forward. The man stopped a short distance away "in front of Thunder World." Officer Porter said that he stopped the truck "because [he] wanted to get at least one vehicle stopped." The defendant "kept going." The record does not indicate when, exactly, the defendant stopped her vehicle but similarly does not indicate that any type of chase ensued. The record does indicate that the officer stopped the defendant's vehicle after he stopped the other driver and took the opportunity to examine the other driver's truck. He did not observe any damage to the other driver's truck. Officer Porter candidly admitted that he "[n]ever saw the two vehicles touching, never saw the impact occur, and . . . was unable to see any damage based on where [he] was at." Nevertheless, he insisted that he stopped both vehicles because he "[w]anted to make sure there were no injured parties in the vehicle" and "wanted to check their status because it was obvious . . . that they had been involved in a motor vehicle accident."

In our view, the circumstances presented do not support the application of the community caretaking exception in this case. The seizure of the defendant occurred some time after and some distance away from the initial incident that caused Officer Porter to activate his blue lights in the first place. Nothing in the record suggests that the defendant exhibited any "level of distress" or that either driver otherwise indicated any need for the officer's assistance. Additionally, the evidence suggested no "risk of danger" or "threat to public safety" had Officer Porter decided not to intervene. Indeed, both drivers had driven away from the scene initially observed by Officer Porter with no damage to either vehicle.

Additionally, we cannot agree with the State that Officer Porter had reasonable suspicion to stop the defendant's vehicle for following too closely, *see* T.C.A. § 55-8-124(a), or for failing to exercise due care, *see id.* § 55-8-136(b). Police officers are constitutionally permitted to conduct a brief investigatory stop supported by specific

and articulable facts leading to a reasonable suspicion that a criminal offense has been or is about to be committed. *Terry v. Ohio*, 392 U.S. 1, 20-23 (1968); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). Whether reasonable suspicion existed in a particular case is a fact-intensive, but objective, analysis. *State v. Garcia*, 123 S.W.3d 335, 344 (Tenn. 2003). The likelihood of criminal activity that is required for reasonable suspicion is not as great as that required for probable cause and is "considerably less" than would be needed to satisfy a preponderance of the evidence standard. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). A court must consider the totality of the circumstances in evaluating whether a police officer's reasonable suspicion is supported by specific and articulable facts. *State v. Hord*, 106 S.W.3d 68, 71 (Tenn. Crim. App. 2002). The totality of the circumstances embraces considerations of the public interest served by the seizure, the nature and scope of the intrusion, and the objective facts on which the law enforcement officer relied in light of his experience. *See State v. Pulley*, 863 S.W.2d 29, 34 (Tenn. 1993).

Officer Porter did not see the defendant driving her vehicle prior to his observing the other driver outside of his truck. He had no opportunity to view how closely the defendant followed the vehicle prior to both drivers' stopping at the traffic light or to observe any measures the defendant might have taken to avoid colliding with the truck in front of her, assuming that she did, in fact, strike the other vehicle. Under these circumstances, the facts do not preponderate against the trial court's finding that Officer Porter stopped the defendant's vehicle "to check the welfare of those involved." Although "'reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause,'" *Pulley*, 863 S.W.2d at 32 (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)), and although the test for determining the presence of reasonable suspicion is an objective one, *see Kenneth McCormick*, slip op. at 15-16, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion," *Terry*, 392 U.S. at 21.

Because Officer Porter lacked reasonable suspicion to stop the defendant's vehicle, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE