# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### November 13, 2013 Session

## STATE OF TENNESSEE v. RICKY J. JONES and SHANE EUGENE MCCLANAHAN

**Appeal from the Criminal Court for Smith County**
**Nos.  2012-CR-150, 2012-CR-193,        David E. Durham, Judge**
**2012-CR-147, 2012-CR-268**

───────────────

**No. M2013-01174-CCA-R3-CD - Filed March 11, 2014**

───────────────

The Defendant-Appellee, Shane Eugene McClanahan, was indicted in Case No. 2012-CR-150 for possession of not less than one-half ounce nor more than ten pounds of marijuana with the intent to sell or deliver, driving while under the influence of marijuana while accompanied by a child under thirteen years of age,[1] and possession of drug paraphernalia. McClanahan was later indicted in Case No. 2012-CR-193 for driving a motor vehicle on a cancelled, suspended, or revoked license and driving a motor vehicle on a cancelled, suspended, or revoked license, second or subsequent offense.  McClanahan's charges stemmed from evidence obtained during a warrantless search of his vehicle.  In a separate case, the Defendant-Appellee, Ricky J. Jones, was indicted in Case No. 2012-CR-147 for the manufacture of marijuana consisting of not less than 100 marijuana plants nor more than 499 marijuana plants, possession of not less than ten pounds, one gram nor more than seventy pounds of marijuana with the intent to sell or deliver, and possession of drug paraphernalia. Jones was later indicted in Case No. 2012-CR-268 for money laundering.  Jones's charges stemmed from evidence obtained pursuant to a warrant that substantially relied on the evidence recovered during the warrantless search of McClanahan's vehicle.  McClanahan and Jones filed motions to suppress the physical evidence recovered in their cases. Following an evidentiary hearing, the trial court granted McClanahan's and Jones's motions to suppress and dismissed their indictments.  In this appeal as of right, the State argues that the trial court erred in granting McClanahan's suppression motions and in dismissing his cases.  Upon review, we affirm the trial court's judgments.

───────────────

[1] We note that McClanahan was charged with violating not only Tennessee Code Annotated section 55-10-401 but also Code section 55-10-414, the statute making it a Class A misdemeanor to violate Code section 55-10-401 while accompanied by a child under thirteen years of age.  Given that Code section 55-10-414 was repealed in 2005, we are unsure why McClanahan was charged with violating this statute.  However, given that we are affirming the judgments of the trial court suppressing the evidence and dismissing the indictments in this case, this issue is moot.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, and JOHN EVERETT WILLIAMS, J., filed an opinion concurring in results. THOMAS T. WOODALL, J., filed a dissenting opinion.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Tom P. Thompson, Jr., District Attorney General; and Jason L. Lawson, Assistant District Attorney General, for the Appellant, State of Tennessee.

J. Branden Bellar and Jacky O. Bellar, for the Defendant-Appellees, Ricky J. Jones and Shane Eugene McClanahan.

## OPINION

## FACTS

Michael J. Agee, a deputy and "K-9 handler" for the Smith County Sheriff's Department, testified that in the early evening of May 11, 2012, he saw the Defendant, Shane Eugene McClanahan, leave a home on Toney Hollow Lane in Smith County, Tennessee, in his vehicle. He followed McClanahan for ten or twelve miles before McClanahan stopped at the Stage Coach General Store on Highway 25. McClanahan parked his vehicle and exited the driver's seat before walking into the store. Deputy Agee followed him inside and saw him purchase a drink at the cash register. He then walked past McClanahan, so close it was "almost brushing distance," and smelled the odor of marijuana. Deputy Agee stated that he was familiar with the odor of marijuana because of his work as a "K-9 handler" for the Smith County and DeKalb County Sheriff's Departments as well as his work as a patrol deputy. He testified about what happened next:

> [McClanahan] started to exit the store, and I was going to exit the store behind him and stop him. The clerk inside the store kept hollering at me to come back and was asking me if I needed anything, and before I could tell her I didn't, and [as I was] trying to get out the door, Mr. McClanahan done got in his vehicle and left out on Highway 25 going towards Trousdale County.

Deputy Agee saw McClanahan get into the driver's seat of his vehicle because he could see him through the store front. He told the clerk he did not need anything and "got in his patrol vehicle and caught up with him and pulled him over." Deputy Agee stated that he stopped McClanahan around "[a] half a mile, a mile maybe" from the store just over the county line in Trousdale County. He said the basis for the stop of McClanahan's vehicle was the "odor

-2-

of marijuana on [McClanahan]." He believed that McClanahan had "been smoking or might have been unable to drive or had some on him." He detailed what happened after stopping the McClanahan:

> I asked him to exit the vehicle, because once I walked up to his window I seen there was a minor child in the passenger's seat beside him, to ask him about the marijuana. I didn't want to ask him about it in front of the child. I didn't know if it was his at the time but I didn't want to ask him about it in front of the kid.

He asked McClanahan to step out of his vehicle, and he complied. Deputy Agee stated:

> I asked him about the marijuana and [McClanahan] stated several times that he didn't have any, and I informed him that I was a K-9 handler and I had the K-9 dog with me and I was going to search his vehicle with the dog, and he said, if that's what I had to do, that's what I had to do.

Deputy Agee recalled McClanahan giving him his name and date of birth because he did not have a driver's license at the time of the stop. He called McClanahan's name and date of birth into dispatch and while he was waiting for a response, he got his service dog out and allowed him to do a "free air search[,]" where the dog sniffed around the outside of McClanahan's vehicle. Shortly thereafter, the dog alerted that it detected drugs on the driver's side of McClanahan's vehicle. After the dog indicated the presence of drugs, some backup officers arrived, and Deputy Agee asked McClanahan to step out of the car. Sheriff Steve Hopper stood with McClanahan while Deputy Agee searched the car. During the search, he uncovered "a brick of marijuana . . . [on] the driver's side rear seat in a tackle box." Deputy Agee stated that he did not receive the information that McClanahan's driver's license had been suspended for the fourth or fifth time until after the search of the vehicle had been completed.

On cross-examination, Deputy Agee said that he first saw McClanahan standing beside his vehicle at a residence on Toney Hollow Lane and that he was not violating the law at the time. He admitted that McClanahan committed no traffic violations in his presence before he stopped at the store. However, he said he lost sight of McClanahan's vehicle for a period of time before he saw the vehicle again on Highway 25 before McClanahan stopped at the store. Deputy Agee stated that he was not looking for McClanahan after he lost sight of him and coincidentally saw him again before McClanahan stopped at the store.

Deputy Agee said that although he smelled the marijuana when he walked past McClanahan, he did not stop him at that time. He explained: "I was going to stop him before he left and the clerks got to asking me did I need something or was I looking for something, and as I was trying to get out the door he was getting in his truck and leaving." He acknowledged that nothing prevented him from telling McClanahan to stop. He also acknowledged that McClanahan committed no traffic violations when he left the store and drove down the road. Although Deputy Agee was only able to observe McClanahan in the store for "[j]ust a few minutes," he said there was nothing in McClanahan's movements that indicated he was impaired. However, he stated that he was unable to look at McClanahan's eyes or hear his speech inside the store. Deputy Agee said that he did not have a videotape of McClanahan's stop because his patrol car was not equipped with a camera.

On redirect examination, when the State asked him why he did not ask McClanahan about the marijuana inside the store, Deputy Agee replied:

> Well, as I was coming in he was at the cash register and as I walked by him that's when I smelled [the marijuana], and he started out as I was turning around, and the clerks, they went to hollering at me and asked me did I need something or could they help me, and as I was trying to get to him, they were trying to talk to me and I was trying to get out the door. I mean, I didn't want to be rude to the clerks but I knew I needed to get with him before he left.

On recross-examination, Deputy Agee said that McClanahan never gave him consent to search his vehicle.

## ANALYSIS

The State argues that the trial court erred in granting McClanahan's suppression motions and in dismissing his indictments. Specifically, the State contends that although the trial court properly determined that Deputy Agee had reasonable suspicion to stop McClanahan when he detected the odor of marijuana, the court erred when it held that Deputy Agee's "time for reasonable suspicion ceased once [McClanahan] got into that vehicle and got down the road." The State asserts that "the passage of a few seconds or minutes does not alter the existence of reasonable suspicion that a person is either using marijuana or in possession of marijuana." It further asserts that because the odor of marijuana, by itself or with other facts and circumstances, can provide sufficient probable cause for a warrantless search or the issuance of a search warrant, the odor of marijuana in this case provided Deputy Agee with reasonable suspicion that a criminal offense was occurring or had occurred. Consequently, the State contends that reasonable suspicion

-4-

justified Deputy Agee's stop of McClanahan's vehicle a half mile to a mile away from the store and that the court's judgment suppressing the evidence should be reversed.

It is well-established that "'a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.'" State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). The Tennessee Supreme Court explained this standard:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Odom, 928 S.W.2d at 23. However, this court's review of a trial court's application of the law to the facts is de novo with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. See U.S. Const. amend IV; Tenn. Const. art. 1, § 7. However, the Tennessee Supreme Court has noted that Tennessee's decisions applying search and seizure law are slightly more restrictive than federal law. State v. Richards, 286 S.W.3d 873, 877-78 (Tenn. 2009) (citing State v. Lakin, 588 S.W.2d 544, 549 (Tenn. 1979)). "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Yeargan, 958 S.W.2d at 629 (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); State v. Bartram, 925 S.W.2d 227, 229-30 (Tenn. 1996)). When determining whether the seizure and search are unreasonable, we must consider "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1, 20 (1968). In other words, "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Id. at 21-22. Pursuant to the "fruit of the poisonous tree" doctrine, evidence that is obtained through an unlawful search or seizure is excluded from use by the State. See Wong Sun v. United States, 371 U.S. 471, 484-85 (1963); State v. Huddleston, 924 S.W.2d 666, 674 (Tenn. 1996).

This exclusionary rule "was designed to protect Fourth Amendment guarantees by deterring lawless searches, seizures, and arrests." Huddleston, 924 S.W.2d at 674.

Because a seizure occurred at the time that Deputy Agee stopped McClanahan's vehicle, we must determine whether this warrantless seizure, which occurred prior to the warrantless search of his vehicle, was reasonable. See State v. Kevon Fly, No. E2006-01979-CCA-R3-CD, 2007 WL 2141543, at *4 (Tenn. Crim. App. July 26, 2007). A well-established exception to the warrant requirement is an investigatory stop based upon "a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." State v. Bridges, 963 S.W.2d 487, 492 (Tenn. 1997) (citing Terry, 392 U.S. at 21; Yeargan, 958 S.W.2d at 630; State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992)). Probable cause is not required for an investigatory stop. State v. Coleman, 791 S.W.2d 504, 505 (Tenn. Crim. App. 1989) (citing Terry, 391 U.S. at 27; Hughes v. State, 588 S.W.3d 296, 305 (Tenn. 1979); State v. Foote, 631 S.W.2d 470, 472 (Tenn. Crim. App. 1982)). Moreover, "'[w]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot . . . ,' the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." Minnesota v. Dickerson, 508 U.S. 366, 373 (1993) (quoting Terry, 392 U.S. at 30) (citing Adams v. Williams, 407 U.S. 143, 145-146 (1972)).

The Tennessee Supreme Court recently restated the law regarding reasonable suspicion:

Reasonable suspicion must be supported by more than the officer's "inchoate and unparticularized suspicion or 'hunch,'" Terry, 392 U.S. at 27, 88 S.Ct. 1868; however, "'reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause . . . [and] can arise from information that is less reliable than that required to show probable cause.'" State v. Pulley, 863 S.W.2d 29, 32 (Tenn. 1993) (quoting Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)); see also Day, 263 S.W.3d at 903.

Trial courts must examine the totality of the circumstances when evaluating whether an officer has established the requisite level of suspicion to justify a Terry stop. Binette, 33 S.W.3d at 218. These circumstances include an officer's observations, information from other law enforcement personnel or agencies, information from citizens, known patterns of criminal offenders, or deductions based upon experience. State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). When evaluating the reasonableness of the police

officer's suspicion, the nature of the crime suspected may be a factor.  See State v. Winn, 974 S.W.2d 700, 703 (Tenn. Crim. App. 1998) ("A frisk has been upheld as reasonable when the suspected crime might typically involve the use of a weapon . . . [such that] an officer [may] reasonably infer that a weapon might be in the possession of the suspect.").

State v. Moats, 403 S.W.3d 170, 178-79 (Tenn. 2013).

In this case, at the conclusion of the suppression hearing, the trial court made the following oral findings of fact and conclusions of law:

I'll tell you, this is a very problematic case.  Let's sort of analyze this thing to the cases and the Constitution.  Of course the analysis starts on any warrantless search that it's presumed unconstitutional.  So the burden comes on the State, and it's a very heavy burden to show that there is a reasonable suspicion and then probable cause and the absent warrant that the vehicle be stopped.

Now, you can go through the case law, and when you look at all the case law on what the objective basis is for stops, reasonable suspicion, of course there's a bunch of it out there.  Unfortunately, I couldn't find a case with this set of facts where we had a reasonable suspicion at one point and then a stop somewhere else.  So it becomes problematic because I couldn't find anything that was sort of similar to this.

But we do know going through what we all know about the law, you know, you look for at W[h]ren [v.] United States, which was decided–a U.S. Supreme Court case way back in 1997.  Let's make sure we're all on the same page.  The Court there held that if there is a sufficient objective factor to justify a stop, the mere fact that the stop is pretextual does not render it unconstitutional.

Now the reason I bring that up, even though there's been no testimony this is a pretextual stop, I'm having a problem putting this thing together given the way the events transpired, but we're going to get back to that in a moment.

What this Court must look at, you know, we go back down and we look at United States [v.] Cortez, which I think we're all familiar with, decided by the U.S. Supreme Court in 1981, and in that particular case it does state, and it's a very good rule, but it talks about that a Court must consider the rational

inferences and deductions that a trained officer may draw from the facts and circumstances known to him. Inferences and deductions that might well elude an untrained person.

In analyzing a reasonableness of an investigatory stop, the Court is not bound or limited in its consideration of the facts. Instead, the Court is entitled to draw its own conclusions from the facts as found, much the way the jury does.

So, we do have testimony that this is a trained officer. We do have testimony this is a trained dog. But here's the problem the Court has, the officer testified from the stand as to a reasonableness that there might be criminal activity afoot. But he testified that for ten or twelve miles, minus the time he left him, there was no indication that this Defendant was driving erratically or illegally.

So, at that point, there's no reasonable suspicion to stop the Defendant, Mr. McClanhan. Now, we can also, I hope agree, because this is the law, Mr. McClanahan was not stopped at the grocery store. You know, every officer has every right to be where they have a right to be. Mr. McClanahan was in the store. The officer was in the store.

Here's where it becomes very problematic. Mr. McClanahan was in there making a purchase and the officer testified that he went in not to purchase anything, just to check on Mr. McClanahan. Well see, I have a problem. He says, Mr. McClanahan made it out the door, but the officer is still there another full–three minutes was his testimony, and because the clerks were trying to interrupt him.

I'm sorry, but I just have a real problem with that. I know human nature. I've been in this business for thirty years. If you think criminal activity is afoot, you don't worry about the clerk. You don't worry about them saying, hey, do you want to buy–you just get out the door and you stop them outside the door. That's just the way law enforcement is supposed to operate.

You don't worry about being rude to people, particularly in this particular case because the testimony was clear. The officer testified that he nearly brushed up against Mr. McClanahan–Officer Agee, Deputy Agee. Yet somehow Mr. McClanahan gets out the door and out to the road before he can even get into his car to get to him.

Now, on the other hand, Deputy Agee testifies he smells dope, but on the other hand, he also testifies, well, it just wasn't important enough for him to get out the door immediately and question him and stop him outside that door. The Court has a real problem with that. I'll just tell you right now.

The other thing the Court has a problem with–now, [Deputy] Ag[]ee testified that he smelled dope on Mr. McClanahan. He could have, but it's also a public place, a grocery store. It could have been on the clerk. It could have been on other people. See, the place to determine that would have been outside the store, because I do think–I do think that Officer Agee had reasonable suspicion once he smelled it on Mr. McClanahan to stop Mr. McClanahan.

Once he got inside that vehicle and got down that highway with all the evidence that this Court's had–remember, we're talking about evidence. We're not talking about my personal opinion. We're talking about evidence and the law. That there was no indication, no physical indication that Mr. McClanahan was under the influence of any drug or alcohol.

The officer even testified that he committed no driving violations, but I think that his time for reasonable suspicion ceased once he got into that vehicle and got down the road.

Here, Deputy Agee testified that he stopped McClanahan's vehicle based on the odor of marijuana he detected when he walked past McClanahan in the store. He claimed that he stopped McClanahan's vehicle because he was unable to detain McClanahan in the store before he got into his car and drove away. We agree with the trial court's conclusion that Deputy Agee had a reasonable suspicion that McClanahan had committed or was about to commit a criminal offense at the moment when he observed the odor of marijuana near McClanahan in the store. Moreover, we conclude that the evidence does not preponderate against the trial court's implicit finding that Deputy Agee's explanation for not acting on this reasonable suspicion sooner was not credible. See Terry, 392 U.S. at 20 ("But we deal here with an entire rubric of police conduct–necessarily swift action predicated upon the on-the-spot observations of the officer on the beat–which historically has not been, and as a practical matter could not be, subjected to the warrant procedure."). Immediately upon detecting the odor of marijuana near McClanahan's person, Deputy Agee should have briefly detained him either inside the store or just outside the store for the purpose of investigating the odor. See United States v. Hensley, 469 U.S. 221, 234 (1985) (holding that "[a] brief

stop and detention at the earliest opportunity after the suspicion arose is fully consistent with the principles of the Fourth Amendment.").

While we acknowledge that police need "an escalating set of flexible responses, graduated in relation to the amount of information they possess[,]" see Terry, 392 U.S. at 10, we conclude that it was unreasonable for Deputy Agee to wait until McClanahan had gotten into his car and driven nearly a mile down the road before initiating the investigatory stop. In reaching this conclusion, we note that the seizure and search of McClanahan's vehicle was significantly more intrusive than a seizure and search of his person at the store would have been. See Illinois v. Caballes, 543 U.S. 405, 419 (2005) ("In applying Terry, the Court has several times indicated that the limitation on "scope" is not confined to the duration of the seizure; it also encompasses the manner in which the seizure is conducted."); Hensley, 469 U.S. at 235 (holding that a police flyer that was supported by a reasonable suspicion on the part of the first police department "justified the length and intrusiveness of the stop and detention" of the defendant by a second police department). The facts in this case necessitated a typical "on-the-street" investigatory stop. Accordingly, we conclude that the trial court properly granted the suppression motions in this case.

I note that Judge Woodall has filed a well-reasoned dissenting opinion in this case, wherein he states that he would reverse the trial court's orders granting the suppression motions filed by McClanahan and Jones, would reverse the orders dismissing these cases, and would reinstate McClanahan's and Jones's charges for further proceedings. Judge Woodall concludes that Deputy Agee's response in initiating the stop of McClanahan's car "was reasonably related in scope to the circumstances" which justified the investigatory detention. Terry, 392 U.S. at 20. I respectfully disagree. In my view, the record supports the trial court's finding that Deputy Agee did not act quickly enough in initiating the investigatory detention after detecting the odor of marijuana near McClanahan's person. Judge Woodall also concludes that because McClanahan's stop was not illegal, the search warrant for Jones's home, which heavily relied on the evidence seized from McClanahan's vehicle, was not constitutionally infirm.

He additionally asserts that even if the stop of McClanahan's vehicle violated McClanahan's Fourth Amendment rights, Jones did not have standing to object to the seizure and search of McClanahan's vehicle for the purpose of challenging the search warrant for his home. Again, I respectfully disagree because I believe that McClanahan's stop was, in fact, illegal. Moreover, I note that any challenge to the suppression of evidence in Jones's cases or the dismissal of Jones's cases has been waived because the State did not challenge the trial court's order suppressing the evidence against Jones or its orders dismissing Jones's cases. Instead, the State's only issue on appeal was whether the trial court erred in granting

-10-

McClanahan's motions to suppress. Accordingly, any issue regarding Jones's cases is waived. <u>See</u> Tenn. R. App. P. 13(b). I affirm the trial court's judgments.

## **CONCLUSION**

Upon review, the trial court's judgments are affirmed.

                                 _____

                                 CAMILLE R. McMULLEN, JUDGE