# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 25, 2014 Session

## STATE OF TENNESSEE v. IZZ-ALDIN AHMED MUSTAFA

**Appeal from the Circuit Court for Sevier County**
**No. 14779-III    Rex Henry Ogle, Judge**

---

**No. E2013-00960-CCA-R3-CD - Filed April 7, 2014**

---

In this appeal as of right, the State challenges the trial court's grant of the defendant's motion to suppress evidence obtained during a traffic stop of the defendant, claiming that the trial court erred by concluding that the defendant had been seized without legal justification. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., joined.   JEFFREY S. BIVINS, J., filed a separate concurring opinion.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; James B. Dunn, District Attorney General; and Gregory C. Eshbaugh, Assistant District Attorney General, for the appellant, State of Tennessee.

Amber D. Haas, Assistant District Public Defender (on appeal); and Bryan E. Delius, Sevierville, Tennessee (at trial), for the appellee, Izz-Aldin Ahmed Mustafa.

## OPINION

Gatlinburg Police Department Officer Robert Cantley arrested the defendant and charged him with driving under the influence on May 29, 2009.  The defendant moved to suppress the evidence gained by Officer Cantley during his May 29, 2009 encounter with the defendant, arguing that Officer Cantley stopped the defendant's vehicle without any legal justification.

At the April 1, 2013 hearing on the defendant's motion, Officer Cantley testified that at approximately 1:00 a.m., he was driving in the far right lane of southbound

U.S. Highway 441 in Gatlinburg when a Volkswagen Beetle two cars ahead of him came to an abrupt stop. The Lexus LS 470 being driven by the defendant "stop[ped] right up on the bumper of that Beetle, not touching but within maybe a foot." Officer Cantley stopped his patrol car behind the defendant, and, after "[m]aybe thirty seconds," he "turned [the] amber directional arrow on from the backside of [his police cruiser] to alert traffic that we weren't moving in the forward lane." Officer Cantley admitted, however, that "[t]here wasn't much traffic on the road at all." Officer Cantley testified that he then exited his vehicle "to go up to see if they were stopped needing directions, if the two people were together, or if they were stopping to pick someone up." As the officer approached the stopped vehicles, the Volkswagen Beetle drove away, but Officer Cantley continued on to the defendant's vehicle.

Officer Cantley testified that the defendant "was in the driver's seat of the first car [he] came to" and that the defendant "rolled his window down maybe a third of the way" to speak with Officer Cantley. The defendant told Officer Cantley that he had stopped only because the car in front of him had done so. It was at that point, he said, that he "noticed an odor associated with an alcoholic beverage come out of the vehicle" and that the defendant's eyes "were red, kind of glassed over." Upon further questioning, the defendant admitted to Officer Cantley that he had consumed an alcoholic beverage earlier that evening. Officer Cantley said that after he obtained the defendant's driver's license and vehicle registration, he returned to his cruiser, where he "called it in as a traffic stop and . . . activated the blue emergency flashing lights on the top of" the cruiser.

During cross-examination, Officer Cantley testified that the Volkswagen Beetle, the defendant's Lexus, and his own police cruiser were the only other vehicles on the roadway at the time the Volkswagen came to an abrupt stop. Officer Cantley said that before exiting his vehicle, he activated the "amber directional arrow" that is "part of the light bar" affixed to the roof of his cruiser. Officer Cantley conceded that the "amber directional arrow" emits light but denied that the light was designed to be a show of authority. Officer Cantley acknowledged that, before the Volkswagen stopped, he had not observed the defendant driving in a manner that would have caused him to stop the defendant's vehicle. The officer also acknowledged that the defendant was forced to stop his vehicle after the Volkswagen came to a stop. Officer Cantley said that he did not drive around the defendant's car to investigate because it would not be "safe . . . to pull up next to a vehicle."

Officer Cantley testified that he was wearing his full police uniform but he could not recall whether he had turned on his spotlight to illuminate the interior of the defendant's car. He said that he "made a left side approach on the [defendant's] vehicle and walked up." Officer Cantley acknowledged that when he exited his vehicle, the defendant did not have room to go around the stopped Volkswagen without backing up toward Officer Cantley. Officer Cantley also acknowledged that he backed his car up before asking the

defendant to perform field sobriety tests, both to give the defendant sufficient room to complete the tests and to ensure that the defendant's performance was captured by the cruiser's camera.

Officer Cantley testified that he had been trained to place his hand on his service weapon when exiting his vehicle "to build muscle memory so that if you have to draw it you know where it's at on your belt at that moment automatically." He said that when approaching a vehicle, "it's just best to keep your hands in a position somewhere above your belt." He acknowledged that he probably "touch[ed]" his weapon when exiting his vehicle in accordance with his training, but he said that he did not think that he approached the defendant's vehicle with his hand on his weapon. He admitted, however, that he had no specific recollection either way. Officer Cantley conceded that he directed the defendant to roll down his window, saying, "I wanted him to know what was going on."

Officer Cantley testified that he approached the defendant's vehicle rather than the Volkswagen because as he "got to [the defendant's] vehicle the Volkswagen went on." Officer Cantley maintained that he would not have effectuated a traffic stop if the defendant had attempted to back up to go around the Volkswagen.

The defendant testified that at approximately 1:00 a.m. on May 29, 2009, he was traveling southbound on U.S. Highway 441 when the Volkswagen Beetle "that was directly in front of [him] . . . all of a sudden came to an abrupt stop." He said that he was forced "to stop abruptly as well because it literally slammed on its brakes and stopped." He said that as he waited for the Volkswagen to move, he saw the "blue lights" of a police cruiser "right on [his] tail" and a police officer "walking with his hand on his gun up to [the defendant's] vehicle." The defendant said that his car was blocked from behind by Officer Cantley's cruiser and in front by the Volkswagen. The defendant testified that he became frightened because he "didn't know what the heck was going on." Officer Cantley then "came up and told [the defendant] to roll down [his] window and asked [the defendant] what [he] was doing."

During cross-examination, the defendant acknowledged that he had been drinking prior to his interaction with Officer Cantley. He adamantly maintained that Officer Cantley activated the "blue lights" rather than the "amber directional arrow" before approaching his car.

In rebuttal, the State recalled Officer Cantley, who testified that if he had activated his blue lights when he first stopped behind the defendant, his in-cruiser camera would have started automatically. He acknowledged that the video recording of part of the traffic stop showed that his blue lights were on, but he explained that he turned the lights on

only after discovering during his initial conversation with the defendant that the defendant had been drinking. He conceded during cross-examination that the "amber directional arrow" was fixed inside the same light bar that emitted the blue lights. He said that the "amber directional arrow" emits light only "to the rear." Officer Cantley admitted that buildings affixed with full-length windows bordered the roadway where the cars were stopped. He acknowledged that any light coming from his cruiser would have been reflected in those windows.

At the conclusion of the proof, the State conceded "that apart from the community caretaker function, there would have been no reason for the encounter." The State argued, however, that despite Officer Cantley's activating the "amber directional arrow" on his cruiser's light bar, the defendant was free to leave. The defendant argued that given the activation of the emergency lights, whatever their color, and the officer's parking his car in such a manner as to prevent the defendant from leaving, the defendant was seized.

The trial court, lamenting the "tough" nature of the case, observed that recent decisions of our supreme court addressing when a seizure occurs had "shifted a burden, a great burden to law enforcement" and that the limitations created by the court "really put[] an officer in a dilem[m]a." The court acknowledged that the Tennessee Constitution provides greater privacy protection than the federal constitution but noted that perhaps a purely objective standard was not the most apt when assessing whether an officer is exercising a community caretaking function. The court suggested that "looking at the officer's intent . . . could more properly be considered." Noting that the court was bound by the decisions promulgated by our supreme court, the court concluded that although "the officer's intention was . . . good. . . . was well founded," the officer did not possess either reasonable suspicion or probable cause to stop the defendant's vehicle. The court stated that despite its belief that Officer Cantley "did something morally and . . . a matter of public safety," it was constrained to conclude, based on the totality of the circumstances, that the defendant was seized. The court said,

> I'm afraid when he put on those lights and I think when he walked up to the car, especially with no other traffic on the road, and walked up to him, because this defendant realistically, while he could have backed up and left, but he probably would have run over the officer if he did, and so I'm, I very reluctantly suppress this, based on the fact that I don't think that this qualifies under the community caretaking provision . . . .

Based upon the court's ruling, the State announced that it lacked the proof to go forward with the defendant's trial, and the case was dismissed. The State then filed a

timely notice of appeal.

In this appeal, the State contends that the trial court erred by concluding that Officer Cantley seized the defendant, arguing that the officer was exercising a community caretaking function and that activation of the "amber directional arrow" was not directed at the defendant. The defendant contends that, regardless of the color of the light emitting from Officer Cantley's cruiser, the totality of the circumstances establishes that the defendant was seized and that the seizure was not supported by reasonable suspicion or probable cause. We review the issue with a few well-settled principles in mind.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). As in all cases on appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). We review the trial court's conclusions of law under a de novo standard without according any presumption of correctness to those conclusions. *See, e.g.*, *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). We review the issue in the present appeal with these standards in mind.

Because stopping an automobile without a warrant and detaining its occupants unquestionably constitutes a seizure, *Delaware v. Prouse*, 440 U.S. 648, 653 (1979), the State in the present situation had the burden of demonstrating the applicability of an exception to the warrant requirement, s*ee, e.g.*, *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005) (temporary detention of an individual during a traffic stop constitutes seizure that implicates the protection of both the state and federal constitutions); *State v. Keith*, 978 S.W.2d 861, 865 (Tenn. 1998). The authority of a police officer to stop a citizen's vehicle is circumscribed by constitutional constraints. Police officers are constitutionally permitted to conduct a brief investigatory stop supported by specific and articulable facts leading to a reasonable suspicion that a criminal offense has been or is about to be committed. *Terry v. Ohio*, 392 U.S. 1, 20-23 (1968); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2002). Whether reasonable suspicion existed in a particular case is a fact-intensive, but objective, analysis. *State v. Garcia*, 123 S.W.3d 335, 344 (Tenn. 2003). The likelihood of criminal activity that is required for reasonable suspicion is not as great as that required for probable cause and is "considerably less" than would be needed to satisfy a preponderance of the evidence

standard. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). A court must consider the totality of the circumstances in evaluating whether a police officer's reasonable suspicion is supported by specific and articulable facts. *State v. Hord*, 106 S.W.3d 68, 71 (Tenn. Crim. App. 2002). The totality of the circumstances embraces considerations of the public interest served by the seizure, the nature and scope of the intrusion, and the objective facts on which the law enforcement officer relied in light of his experience. *See State v. Pulley*, 863 S.W.2d 29, 34 (Tenn. 1993). The objective facts on which an officer relies may include his or her own observations, information obtained from other officers or agencies, offenders' patterns of operation, and information from informants. *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992).

Particularly relevant to the issue presented here is the supreme court's recent opinion in *State v. Moats*. In that case, an Etowah Police Department Officer observed Moats sitting in a parked car in the parking lot of a grocery store at 2:00 a.m. *See State v. Moats*, 403 S.W.3d 170, 175 (Tenn. 2013). Upon observing the truck in the same location five minutes later, the officer parked "behind the truck, activated her blue lights, and called in the license plate number." *Id.* During a brief conversation with the defendant, the officer observed an open beer in the cup holder and noticed that Moats "appeared to be 'disoriented, very slow to speak, very sleepy acting.'" *Id.* Moats eventually failed field sobriety tests and was placed under arrest for DUI. On appeal, the supreme court reversed Moats's conviction, concluding that "the circumstances here demonstrate that the officer was not acting within a community caretaking role and did not have reasonable suspicion or probable cause to seize." *Moats*, 403 S.W.3d at 188.

The *Moats* court reiterated that it had explicitly rejected the test promulgated by the United States Supreme Court to determine whether a person has been seized under the terms of the state constitution, "opting instead" to retain the test "originally set forth in *Mendenhall*, that is, whether, in view of all of the circumstances surrounding the incident, a reasonable person would have believed he or she was not free to leave." *Moats*, 403 S.W.3d at 182 (citations and internal quotation marks omitted). As the court emphasized, the determination whether a seizure has occurred requires examination of "'the circumstances from the standpoint of the citizen, not the police officer. If a reasonable person would not feel free to leave due to an officer's show of authority, that constitutes a seizure, regardless of why the officer made a show of authority.'" *Id.* at 184 (quoting *State v. Gonzales*, 52 S.W.3d 90, 97-98 (Tenn. Crim. App. 2000)).

At oral argument, the parties placed particular emphasis on the color and character of the emergency equipment activated by Officer Cantley at the beginning of his encounter with the defendant. The State, relying on Officer Cantley's testimony that he activated only the "amber directional arrow" visible only from the rear of his vehicle, argued

that the defendant was not seized because the officer did not activate his blue lights. The defendant, relying, in part, on his own recollection that Officer Cantley activated his blue lights, argued that activation of the blue lights effectuated a seizure. Our supreme court, in *Moats*, addressed the seemingly bright-line rule adopted in *State v. Williams*, 185 S.W.3d 311 (Tenn. 2005), "that the activation of blue lights constitutes a seizure and, as a practical matter, negates the community caretaking function." *Moats*, 403 S.W.3d at 184. The court questioned its own application of the law to the facts in *Williams* and noted that "the establishment of a bright-line rule may not be possible." *Id*. Importantly, the court observed that circumstances could exist justifying the activation of blue lights within the officer's exercise of a valid community caretaking function. *Id.* at 185; *see also id.* at 184 ("'Not all use of the emergency blue lights on a patrol car will constitute a show of authority resulting in the seizure of a person. . . . *[W]hen officers act in their community caretaking function, they may want to activate their emergency equipment for their own safety and the safety of other motorists*.'" (quoting *State v. Williams*, 185 S.W.3d 311, 318 (Tenn. 2005) (emphasis in *Moats*)). Ultimately the court held:

> Although the activation of blue lights on a police vehicle ordinarily triggers a stop or seizure, thereby implicating constitutional protections, the totality of the circumstances must be considered to determine whether the police officer was acting within a community caretaking role, which is a concept separate and distinct from the investigation of possible criminal activity. As a general rule, if the activation of blue lights is not used as a show of authority directed at a particular person, the officer is acting within the community caretaking function and need not support his or her actions with reasonable suspicion or probable cause.

*Id.*

In both *Moats* and *Williams*, the supreme court looked to factors such as the existence of "'*an accident or other peril*'" or circumstances that would indicate that the defendant "'was in need of assistance'" to determine whether "the officer was acting within his community caretaking role." *Id.* at 184 (quoting *Williams*, 185 S.W.3d at 318 (emphasis in *Moats*)). In *Moats*, the court also observed that the officer "parked her patrol car immediately behind the [d]efendant's truck, which was the only vehicle in the otherwise empty parking lot" and that "[t]here was no objective indication that Officer Bige needed to activate the blue lights to protect either the [d]efendant or other motorists from possible harm." *Moats*, 403 S.W.3d at 186.

Here, the record established that the defendant's car was traveling southbound on Highway 441 between a Volkswagen Beetle and Officer Cantley's cruiser when the Volkswagen came to an abrupt stop. Those three cars were the only vehicles on the roadway at that time. The defendant stopped his vehicle behind the Volkswagen, and Officer Cantley stopped his vehicle behind the defendant. Officer Cantley testified that he did not observe any driving by the defendant that gave rise to either reasonable suspicion or probable cause to stop the vehicle. After passage of 30 seconds, Officer Cantley activated some part of the light bar affixed to the roof of his cruiser and exited the vehicle.[1] The defendant testified that the officer approached the defendant's car with his hand resting on his service weapon, and Officer Cantley stated that although he could not recall whether he had done so, he had been trained to "touch" his weapon when exiting his vehicle. As Officer Cantley arrived at the defendant's vehicle, the Volkswagen drove away. Officer Cantley nevertheless proceeded to the defendant's window and directed him to roll the window down.

Examining the totality of the circumstances from the perspective of the defendant, the trial court concluded that a reasonable person would not feel free to leave given Officer Cantley's show of authority, regardless of the officer's reason for making the showing. *See Moats*, 403 S.W.3d at 184. Based upon the trial court's implicit fact finding about the relative position of the vehicles and the nature of the officer's movement toward his service weapon, we agree. We emphasize that our conclusion does not rest solely upon the location, character, or color of the emergency lights activated by Officer Cantley in this instance. Instead, we base our conclusion on the totality of the circumstances: (1) because the Volkswagen was stopped in front of him and Officer Cantley behind, the defendant could not move his car without backing up toward Officer Cantley; (2) Officer Cantley activated some emergency lighting that, the parties agreed, would have reflected off of the nearby storefronts; (3) Officer Cantley, at the very least, touched his weapon when exiting his vehicle and walking toward the defendant's car; (4) the officer proceeded to the defendant's car even after the Volkswagen, which had created the original impediment, drove away; (5) by the time the officer made his final approach to the defendant's window, the defendant's was the only other car on the roadway; and (6) no evidence that "an accident or other peril" or that the defendant was otherwise in need of assistance existed. Based upon these circumstances, the record supports the trial court's decision to suppress the evidence obtained during Officer Cantley's stop of the defendant.

Accordingly, the judgment of the trial court is affirmed.

---

[1]The trial court did not express a finding as to whether Officer Cantley initially activated the "amber directional arrow" or the blue lights.

_____
JAMES CURWOOD WITT, JR., JUDGE