IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 20, 2015

## STATE OF TENNESSEE v. CALEB JOSEPH LATHAM

**Appeal from the Circuit Court for Blount County**
**No. C-21955    Tammy M. Harrington,  Judge**

_____

**No. E2014-01606-CCA-R3-CD – Filed August 3, 2015**

_____

The Defendant, Caleb Joseph Latham, entered guilty pleas to driving under the influence ("DUI"), first offense, and DUI per se. See Tenn. Code Ann. § 55-10-401. As a part of his guilty pleas, the Defendant reserved a certified question of law pursuant to Tennessee Rule of Criminal Procedure 37(b)(2) challenging his warrantless seizure. Following our review, we conclude that the trial court should have granted the Defendant's motion to suppress because he was subjected to a seizure without reasonable suspicion. The ruling of the trial court is reversed, and the charges against the Defendant are dismissed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed, Case Dismissed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and CAMILLE R. MCMULLEN, J., joined.

J. Liddell Kirk (on appeal), Knoxville, Tennessee; Raymond Mack Garner, District Public Defender; and Matthew Elrod, Assistant District Public Defender (at trial), for the Appellant, Caleb Joseph Latham.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Betsy Brockman Smith, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

On November 4, 2013, the Blount County grand jury returned an indictment charging the Defendant with DUI and DUI per se in violation of Tennessee Code

Annotated section 55-10-403. On June 30, 2014, the Defendant filed a motion to suppress evidence seized as a result of the seizure and search accompanying his arrest. The motion to suppress alleged that the Defendant's seizure was unlawful because the seizing officer did not have reasonable suspicion that a criminal offense had been or was about to be committed. The Defendant further argued that any evidence gained subsequent to the unlawful seizure should be suppressed as fruit of the poisonous tree. The trial court held a hearing on the motion to suppress on July 14, 2014, and the following evidence was presented.

At approximately 2:00 a.m. on November 25, 2012, Officer Matt Wyrick of the Maryville Police Department ("MPD") was on patrol when he pulled into a Hardee's parking lot and observed a car in the back left corner of the parking lot. The car did not appear to be running, although the car's left turn signal was activated. Officer Wyrick also observed that the car was not parked in a parking space and was "right up next to the dumpster." Officer Wyrick testified that "it struck [him] as being odd" that a car would be "sitting in [a] back corner parking lot of a closed business around 2:00 a.m. with its turn signal on," and he decided to investigate further.

Officer Wyrick testified that he was concerned that criminal activity could have been going on or that someone might have had a medical emergency. He also considered that "there might have been some type of sexual encounter going on inside the vehicle" given the car's location in the back corner of the parking lot.

As Officer Wyrick pulled in closer to the car, he was able to observe several people inside the car. Officer Wyrick testified that he parked his patrol car behind the suspect car, and he agreed that, due to the positioning of his patrol car, the suspect car was not able to leave at that point. Officer Wyrick testified that he did not activate his blue lights and that only his car's headlights were turned on.

Officer Wyrick approached the car and began speaking with the driver, whom Officer Wyrick identified as the Defendant. The Defendant told Officer Wyrick that "[t]here was [sic] some ignition problems with the car and they were trying to get the car started to leave." Officer Wyrick described the Defendant's demeanor as "very calm, not argumentative at all. . . . just like a normal person." According to Officer Wyrick, there were no other officers on the scene at the time, and he did not remove his gun from its holster.

While Officer Wyrick was standing next to the car speaking with the Defendant, he smelled a "strong odor of alcohol coming from the Defendant and from the subjects that were inside the car." When he asked the Defendant whether he had been drinking, the Defendant told Officer Wyrick that he had consumed five or six beers. Officer

Wyrick instructed the Defendant to "hang tight" while he went back to his patrol car to request a backup unit.

On cross-examination, Officer Wyrick testified that there were no yellow lines delineating parking spaces near the dumpster area on the night the Defendant was arrested. Officer Wyrick agreed that, on the night in question, he had not received a phone call or dispatch request to investigate the Hardee's area. Rather, he was on a regular patrol through the parking lot when he noticed the vehicle. Officer Wyrick agreed that he would characterize the car as "odd" and "suspicious." However, he further agreed that the car was parked legally on private property and that there was no traffic infraction taking place. Officer Wyrick agreed that there was nothing unlawful about the turn signal being on.

According to Officer Wyrick, there was a sports bar located next-door to the Hardee's, which was still open for business, but he denied that there was anyone else in the area near where the Defendant's car was parked. Officer Wyrick testified that, to the best of his knowledge, the Hardee's parking lot adjoined the parking lot of the sports bar and that there were no curbs separating the two lots.

Officer Wyrick testified that his patrol car was parked "probably a car length or less" behind the Defendant's vehicle. He agreed that the Defendant's car was "boxed in" because there was a dumpster to the left of the car, a fence to the right of the car, and the patrol car was parked directly behind the Defendant's car.

Officer Wyrick admitted that, at the time, he could not be certain that the Defendant was not a Hardee's employee, and he agreed that the Defendant could have been in the parking lot for a legitimate reason. Officer Wyrick was asked whether he "just more or less had a hunch and . . . wanted to check something out." Officer Wyrick responded that he "knew that [he] saw something and that made [him] investigate further . . . ." He testified that he was suspicious of the car based on "the time of the day, the location that the car was at in the parking lot, and . . . movement inside the car . . . ." According to Officer Wyrick, he did not smell alcohol until the Defendant rolled the car window down and Officer Wyrick began speaking with him.

The trial court made the following oral ruling denying the Defendant's motion to suppress:

> I do find that based on the specific positioning of the officer's police car[,] and the fact that the Defendant could not move his car because the officer's car was in his path[,] that [consensual] encounter is not an appropriate analysis for the [c]ourt to consider. It's -- I believe the officer testified

truthfully and I appreciate that and quite simply [the Defendant] couldn't move his car if the officer's car was in his way. So, it's not a [consensual] encounter. It's a seizure.

And so then it becomes -- the analysis, quite correctly pointed out, becomes reasonable suspicion. And the [c]ourt must then look at the totality of the circumstances of what the officer had before him at that time as far as in making a determination and whether reasonable suspicion existed. . . . There are numerous cases that being parked at a closed business is just simply not enough for reasonable suspicion. . . . So, we have to look at -- there are a few things in this case that the officer testified to. It's 2:00 a.m., the business is closed. That, in and of itself, is not enough for reasonable suspicion. He is well within his rights to be in any parking lot unless it's been posted or unless there's other issues. I mean, he can be there. The officer said that he was parked incorrectly and he was parked near a dumpster. The officer testified that he found that to be unusual that the car was parked near the dumpster. And further he went on to say that the turn signal for the vehicle was on. And while that may seem like a minor detail, it does distinguish the facts from just merely sitting in a parking lot. It's after hours, it's dark, the business is closed. But that's coupled with incorrect parking, parked near a dumpster, and a turn signal is on. So I think that raises a different issue[]. There's more of an issue. And so based on the totality of the circumstances, I do find that the approach of the vehicle on the seizure was [based upon] reasonable suspicion. I'm going to uphold the stop. . . . But I will say this: It was very close. Very close.

Following the trial court's denial of his motion to suppress, the Defendant pled guilty to DUI in count one and DUI per se in count two; count one merged into count two by operation of law. As part of his guilty pleas, the Defendant properly preserved the following certified question of law pursuant to Tennessee Rule of Criminal Procedure 37(b)(2):

Whether the officer's conduct in blocking the Defendant's vehicle's path with a patrol vehicle amounted to a seizure[,] and if so, whether the seizure of the Defendant was based upon an articulable reasonable suspicion that he was engaged in some type of criminal conduct justifying said seizure (in violation of [the] Defendant's rights pursuant to the Fourth and Fourteenth Amendments to the [United States] Constitution and [a]rticle I, [s]ection VII of the Tennessee Constitution).

ANALYSIS

On appeal, the Defendant contends that he was subjected to an unlawful seizure when Officer Wyrick blocked his car's path with his patrol vehicle. Specifically, the Defendant contends that being parked near a dumpster in the parking lot of a closed business with his car's turn signal on did not provide the officer with reasonable suspicion to believe that criminal activity was taking place. The State responds that "Officer Wyrick expressed specific and articulable facts" that "would lead a reasonable officer to believe the [D]efendant committed or was about to commit a crime or the [D]efendant was in need of medical assistance." The State argues that "the inability to properly operate a motor vehicle is indicative of impairment," which would provide an officer with reasonable suspicion, justifying a brief seizure and further investigation. Alternatively, the State argues that the officer was exercising his role as a community caretaker because he was concerned that the car's occupants might be in need of medical help. To support this line of reasoning, the State asks that we adopt the community caretaking function as an exception to the warrant requirement.

*I. Standard of Review*

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000). Likewise, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial court, and this court will not reverse the trial court's factual findings unless the evidence preponderates against them. Id. (citing State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Both proof presented at the suppression hearing and proof presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). The evidence is to be viewed in the light most favorable to the prevailing party on a motion to suppress with all reasonable and legitimate inferences that may be drawn by the evidence. State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000). However, our review of the application of the law to the facts is de novo. State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998).

*II. Warrantless Seizure*

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. Any warrantless search or seizure is presumed to be unreasonable and requires the State to prove by a preponderance of the evidence that the search or seizure was conducted

pursuant to an exception to the warrant requirement. State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998). Two types of police-citizen encounters are considered seizures for constitutional analysis purposes: "(1) the full-scale arrest, which must be supported by probable cause; [and] (2) the brief investigatory detention, which must be supported by reasonable suspicion of wrong-doing[.]" State v. Day, 263 S.W.3d 891, 901 (Tenn. 2008) (citations omitted).

A police officer may make an investigatory stop based upon reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed. Terry v. Ohio, 329 U.S. 1, 20-21 (1968); Binette, 33 S.W.3d at 218. Furthermore, a police officer must have such a reasonable suspicion in order to stop a vehicle without a warrant. State v. Randolph, 74 S.W.3d 330, 334 (Tenn. 2002). Reasonable suspicion is determined by an examination of the totality of the circumstances. Binette, 33 S.W.3d at 218. Circumstances relevant to an analysis of reasonable suspicion include "the officer's personal objective observations . . . [and any] [r]ational inferences and deductions that a trained officer may draw from the facts and circumstances known to him." State v. Yeargan, 958 S.W.2d 626, 632 (Tenn. 1997).

The Defendant's certified question contemplates a two-part inquiry: (1) whether Officer Wyrick's actions constituted a seizure; and (2) if so, whether that seizure was supported by reasonable suspicion. As to the first issue, the State does not challenge the trial court's finding that the Defendant was seized when Officer Wyrick parked behind his car. A seizure occurs when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980); see also State v. Daniel, 12 S.W.3d 420, 425 (Tenn. 2000). Here, Officer Wyrick testified that, because of the placement of his patrol car, it would have actually been impossible for the Defendant to move his vehicle and terminate the encounter. Therefore, we agree that the Defendant was seized at the time that Officer Wyrick parked his patrol car behind the Defendant's vehicle.

Next, we turn to the second inquiry: whether Officer Wyrick had reasonable suspicion that there was criminal activity taking place at the time he parked his patrol car behind the Defendant's car. In State v. Moats, our supreme court examined whether an officer had reasonable suspicion to seize the defendant under facts similar to the present case. 403 S.W.3d 170 (2013). In Moats, a police officer observed the defendant parked in his pick-up truck at 2:00 a.m. in the parking lot of a grocery store, which was closed at the time. Id. at 175. The pick-up truck's headlights were on, although the truck's engine was not running. Id. There were "no loitering" signs posted in the area, and a business owner had previously requested that police patrol the area after business hours due to suspected illegal drug activity. Id. The officer described the truck as "out of the ordinary" but continued on her patrol. Id. She returned to the parking lot about five

-6-

minutes later and the truck was in the same position.  Id.  At that time, she parked her patrol car behind the truck, activated her blue lights, and called in the license plate number.  Id.  The officer approached the defendant's vehicle, and she saw an open beer can on the truck's dashboard; the defendant admitted to drinking "a few beers."  Id.  Thereafter, the defendant performed poorly on several field sobriety tests, and a later test for blood alcohol content registered 0.19%.  Id.

In Moats, the officer testified that the defendant was the only person in the parking lot, that she did not see him drive the truck or do anything illegal before she approached the truck, and that the defendant did not appear to need medical assistance.  Id.  Rather, the officer testified that it was "strange that a car would be . . .  in a parking lot at almost . . . 2 a.m. with the lights on."  Id.

Following its review, our supreme court concluded that the officer "was unable to offer specific and articulable facts sufficient to qualify as reasonable suspicion that the [d]efendant had committed or was about to commit a criminal offense."  Id. at 180.  The court focused on the officer's admission that "she did not see the [d]efendant drive the truck, engage in a drug transaction, or otherwise do anything illegal before activating her blue lights and approaching the truck."  Id.  The court concluded that "[t]he early morning hour and a general request for officers to be on the lookout for suspected illegal drug activity do not, without more, rise to the level of reasonable suspicion."  Id.

In Moats, the court further concluded that the officer's actions were not a valid exercise of her community caretaking role because, taking into account the totality of the circumstances at the time she activated her blue lights, a reasonable person would not have felt free to leave.  Id. at 186.  The court noted that the community caretaking function falls within a third-tier of police-citizen encounters, which are consensual and do not require probable cause or reasonable suspicion.  Id. at 180.  "These consensual encounters . . . 'involve no coercion or detention.'"  Id. (citing State v. Hawkins, 969 S.W.2d 936, 939 (Tenn. Crim. App. 1997)).  Because the officer's actions constituted a seizure, the encounter was not consensual, and had to be supported by either reasonable suspicion or probable cause in order to be lawful.  Id. at 182, 186.

Likewise, in United States v. See, the Sixth Circuit Court of Appeals reversed a district court's denial of a motion to suppress under similar circumstances.  574 F.3d 309 (6th. Cir. 2009).  In See, the officer was on routine patrol at a housing complex in a high-crime area, when he spotted the defendant parked "in a dimly lit part of the parking lot farther from the building than other vacant spots."  Id. at 311.  The officer had previously been instructed to pay "special attention" to the area.  Id.  There were three men in the car, which had been backed into a parking space.  Id.  The officer parked his patrol car directly in front of the defendant's vehicle so that the defendant could not move his

vehicle. Id. The officer eventually searched the defendant's car and found a firearm that had its serial number removed, and the defendant was arrested. Id.

The See court first determined that the officer's blocking of the defendant's car constituted a warrantless Terry seizure because "a reasonable person in [the defendant's] position would not have felt free to leave." Id. at 313. The court noted that the officer "was not responding to a complaint, he did not suspect the men of a specific crime, he had not seen the men sitting in the car for an extended period of time, he was not acting on a tip, he had not seen the men do anything suspicious, and the men did not try to flee upon seeing the [officer] approach." Id. at 314. Based on these facts, the court concluded that the officer "did not have reasonable suspicion that criminal activity was occurring, and the Terry stop was therefore improper." Id.

Turning to the present case, after carefully reviewing the record, we conclude that Officer Wyrick did not have reasonable suspicion that criminal activity had occurred or was about to occur at the time the Defendant was seized. At the time Officer Wyrick seized the Defendant, Officer Wyrick was in possession of the following information: the Defendant's vehicle was parked in the Hardee's parking lot in the early morning hours, and the restaurant was closed; the car was not parked in a designated parking space but, instead, was stopped near a dumpster; the car's turn signal was on despite the fact that the car was not running at the time; and, as Officer Wyrick pulled in closer to the Defendant's vehicle, he could see that the car had more than one occupant.

At the suppression hearing, Officer Wyrick was unable to articulate a concrete reason for seizing the Defendant. When asked whether he was concerned that criminal activity might be occurring, Officer Wyrick responded, "That's a possibility, yes. That was also in my mind." He went on to testify that he was "concerned about whether somebody in the car had maybe had a medical emergency, slumped over, turned their turn signal on by accident or had passed out in the vehicle." He testified that the location of the car "next to a dumpster was not a normal place for a car to be parked at 2:00 in the morning[,]" and it also "struck [him] as there might have been some type of sexual encounter going on inside the vehicle. Or possibly narcotics." According to Officer Wyrick, he "knew that [he] saw something and that made [him] investigate further . . . ." However, in determining whether to make a brief investigatory stop, an officer may not rely upon an "inchoate and unparticularized suspicion or 'hunch.'" Terry, 392 U.S. at 27.

The State relies on the fact that the Defendant's car was "improperly parked" near a dumpster in support of its argument that the officer had reasonable suspicion. However, Officer Wyrick testified that there were no yellow lines delineating parking spaces in the area where the Defendant's car was parked. In fact, according to Officer

Wyrick, the Defendant's car was parked legally on private property, and no traffic infraction had been committed.

Additionally, although the trial court noted that the fact that the turn signal was activated distinguished this case from others, we fail to see how a turn signal would increase an officer's reasonable suspicion that criminal activity is taking place. In Moats, the defendant was parked with his car's headlights on and the engine turned off. We consider that situation analogous to the present case, where the Defendant was parked with his car turned off and a turn signal activated. In fact, Officer Wyrick agreed that the Defendant could have had "all his lights on if he wanted to." Surely, such a situation might lead an officer to wonder if the occupants of the car might need help, and thus, could authorize an officer's community caretaking role, but it does not, without something more, provide the reasonable suspicion necessary to authorize a seizure. See See, 574 F.3d at 315 (noting that the officer "had every right to investigate further, but he should have simply parked his patrol car alongside [the defendant's] vehicle to carry out the investigation in a consensual manner") (Gilman, J., concurring). Because Officer Wyrick lacked reasonable suspicion to seize the Defendant, all evidence obtained attendant to the seizure should have been suppressed.

Finally, we decline the State's invitation to adopt the community caretaking function as an exception to the warrant requirement. That issue was squarely decided by our supreme court in Moats. In the face of a vigorous dissent, the Moats majority noted the following:

> We are aware that the doctrine of community caretaking, as interpreted and applied in our state—i.e., as a type of third-tier consensual police-citizen encounter—represents a minority rule among other jurisdictions. Indeed, as the dissent points out, the vast majority of courts have applied the community caretaking doctrine as "an exception" to the warrant requirement of the Fourth Amendment to the United States Constitution. E.g., United States v. Coccia, 446 F.3d 233, 237-38 (1st Cir. 2006); United States v. Pichany, 687 F.2d 204, 205 (7th Cir. 1982); People v. Luedemann, 857 N.E.2d 187, 198-99 (2006); State v. Graham, 175 P.3d 885, 890 (2007); Ullom v. Miller, 705 S.E.2d 111, 120 (2010). As noted in this opinion, however, this Court has for decades interpreted article I, section 7 of the Tennessee Constitution as imposing stronger protections than those of the federal constitution, which, under stare decisis, we are not prepared to dismissively brush aside. Particularly in the area of search and seizure law, we have often rejected the standards adopted by the United States Supreme Court in favor of more protective doctrines, tests, and rules. See, e.g., State v. Carter, 16 S.W.3d 762, 768 n.8 (Tenn. 2000) (noting that

Tennessee has never recognized the "good faith" exception to the exclusionary rule that was adopted by the Supreme Court in United States v. Leon, 468 U.S. 897 (1984)); State v. Jacumin, 778 S.W.2d 430, 435-36 (Tenn. 1989) (refusing to adopt the test for probable cause as established by the Supreme Court in Illinois v. Gates, 462 U.S. 213 (1983), because it is "inadequate"); State v. Lakin, 588 S.W.2d 544, 549 n.2 (Tenn. 1979) ("Where, . . . as in the particular phase of search and seizure law under consideration, there has been a settled development of state constitutional law which does not contravene the federal, we are not inclined to overrule earlier decisions unless they are demonstrably erroneous.").

While we recognize the rationale underlying the majority rule, we see no reason to depart from the standards of community caretaking that have developed in our state, particularly because neither party has articulated a persuasive basis for recognizing this as yet another exception to the constitutional protections against unreasonable searches and seizures. See Lakin, 588 S.W.2d at 549 (recognizing that, in the context of the "open fields" doctrine, "[a]lthough the decisions in this state may be somewhat more restrictive than those in other states or than federal decisions, no compelling reason has been demonstrated in this case for modifying or overruling them"). The [d]efendant has argued strongly against treating community caretaking as an exception to the warrant requirement, and the State has simply asserted that "the touchstone of this fact-intensive analysis is reasonableness." Unlike the dissent, we decline to adopt an approach to community caretaking that would diminish "the most basic constitutional rule" that warrantless searches and seizures are per se unreasonable, simply because it has been adopted by a majority of other courts.

403 S.W.3d at 187-88 n.8. The cases supporting warrantless searches and seizures based upon the community caretaking doctrine involve circumstances wherein it was apparent that a person or persons were in danger of suffering injury or in need of immediate help. Because the danger was apparent, obviously the person under threat would readily consent to a warrantless entry or seizure for his or her own protection and benefit. However, an officer's subjective thought or guess as to which of several circumstances might in fact exist is not, and should not be, an exception to the warrant requirement. Moats does not foreclose an officer's ability to engage in the community caretaking function, it merely strikes a balance between an officer's role in that respect and a citizen's right to be free from warrantless search or seizure. The State's argument in this respect is without merit.

-10-

## CONCLUSION

In sum, we conclude that the Defendant was subjected to an unlawful seizure without reasonable suspicion.  Therefore, the trial court erred in denying his motion to suppress evidence obtained subsequent to that illegal seizure.  The ruling of the trial court is reversed, and the charges against the Defendant are dismissed.

_____
D. KELLY THOMAS, JR., JUDGE